27 A.3d 565

MARYLAND DEPARTMENT OF the ENVIRONMENT, et al.

v.

DAYS COVE RECLAMATION CO., INC.

No. 1725, Sept. Term, 2008.

Court of Special Appeals of Maryland.

Aug. 30, 2011.

**258**

Dan Friedman (Douglas F. Gansler, Atty. Gen., Kathryn M. Rowe, Jacquelin Russell, on the brief), Annapolis, MD, for Appellant.

James J. Doyle, III (Warren K. Rich, on the brief), Annapolis, MD, for Appellee.

Panel: KRAUSER, C.J., JAMES R. EYLER, and CHARLES E. MOYLAN, JR., (Retired, Specially Assigned), JJ.[1]

KRAUSER, C.J.

We are asked to decide whether Chapter 161 of the 2007 Laws of Maryland [2] is a "special law" under Article III, § 33

---

1. Judge Robert A. Zarnoch did not participate in the Court's decision to report this opinion pursuant to Md. Rule 8–605.1.

2. Chapter 161 is codified, without change, as Maryland Code (1987, 2007 Repl.Vol., 2010 Supp.), section 9–204(m) of the Environment Article ("EN").

of the Maryland Constitution and, as a consequence, prohibited by it.

Enacted in 2007, Chapter 161 prohibits the Maryland Department of the Environment ("MDE") from issuing a permit for the construction or operation of a rubble landfill within close proximity to certain waterways in the State of Maryland. Fearing that its planned landfill was subject to this legislative proscription, Days Cove Reclamation Company ("Days Cove"), appellee, filed an action in the Circuit Court for Baltimore City, claiming that Chapter 161 is an unconstitutional "special law," that it denies Days Cove due process and equal protection of the law, and that it effectuates an unlawful taking of Days Cove's property. Concluding that Chapter 161 is an unconstitutional special law, the Baltimore City circuit court granted summary judgment in favor of Days Cove. The State of Maryland, the MDE, and its Secretary, appellants, contend that that decision was in error and request that we reverse and remand, a request that, for the reasons set forth below, we shall grant.

## BACKGROUND

In 1995, before the enactment of Chapter 161, Days Cove, with the intention of constructing and operating a rubble landfill, leased a parcel of land in Queen Anne's County that would later fall within the proscriptions of that statute. Although Queen Anne's County initially approved the construction of the landfill and incorporated it into the county's solid waste management plan, it thereafter repeatedly attempted to withdraw its approval. Those attempts proved unsuccessful at the appellate level. *See Days Cove Reclamation Co. v. Queen Anne's County*, 146 Md.App. 469, 807 A.2d 156 (2002) (*"Days Cove II "*); *County Comm'rs of Queen Anne's County v. Days Cove Reclamation Co.*, 122 Md.App. 505, 713 A.2d 351 (1998) (*"Days Cove I "*).

In *Days Cove I*, we found that an attempt by the Queen Anne's County Commissioners to amend the County's solid waste management plan, so as to de-list Days Cove's proposed

rubble landfill from that plan, was pre-empted by State law.[3] We reasoned that the Commissioners' prior inclusion of the landfill in the plan had the effect of completing and thereby ending its planning role within the general scheme established by the Maryland Code, §§ 9–501 through 9–521 of the Environment Article ("EN"), because the "legislature has reserved the 'permit-issuing segment' of the process to the MDE." *Days Cove I,* 122 Md.App. at 523, 713 A.2d 351. We, therefore, concluded that the Commissioners' attempt to de-list the proposed rubble landfill "breach[ed] the 'permit' power . . . specifically reserved for the State," *id.* at 526, 713 A.2d 351, and upheld the ruling of the circuit court, enjoining the Commissioners from amending the County's solid waste management plan. *Id.* at 520–26, 713 A.2d 351. Then, in *Days Cove II,* when the Queen Anne's County Board of Appeals denied Days Cove's application for a conditional use to operate its proposed rubble landfill, we declared that, in the absence of any evidence to demonstrate the unsuitability of the site, the Board of Appeals was required to issue Days Cove a conditional-use zoning permit for its proposed landfill. *Days Cove II,* 146 Md.App. at 485–94, 506–08, 807 A.2d 156.

But that did not signal the conclusion of the approval process. Days Cove's landfill application still had to be approved by the MDE.

Parenthetically, we note that, in 2004, Queen Anne's County did amend its zoning ordinance to exclude rubble landfills as a conditional use anywhere in the county. That amendment does not, as both sides acknowledge, apply to Days Cove's pending application, but it does prospectively preclude any future applications.

Then, in 2006, the General Assembly enacted, as an emergency measure, the legislative predecessor to Chapter 161, Chapter 228, Laws of Maryland 2006 ("Chapter 228"), which

---

**3.** The statutes that, we held, pre-empted the Queen Anne's County Commissioners from amending the County's solid waste management plan included Maryland Code, EN § 9–503 and Maryland Code, Art. 66B, § 4.01(d).

created the same measures to protect the same waterways that Chapter 161 later would. But, its protective measures, in contrast to those of Chapter 161, were to expire after three years.[4] It amended EN § 9–204 by inserting a new subsection (m):

> The Secretary may not issue any permit under this section to construct or operate a rubble landfill within 4 miles of Unicorn Lake in Queen Anne's County, within 1 mile of the Piscataway Creek, a Piscataway Creek tributary, or the Mattawoman Creek, or within 1 mile of any other tributary in Prince George's County that flows directly or indirectly into the Potomac River.

In response to Chapter 228, Days Cove filed a lawsuit in the Circuit Court for Baltimore City, claiming, among other things, that Chapter 228, the precursor to Chapter 161, was an unconstitutional "special law." The circuit court disagreed and denied Days Cove's subsequent request for summary relief on that ground. This suit was voluntarily dismissed when Chapter 228 was superceded by Chapter 161, which reimposes Chapter 228's prohibitions, but contains no cut-off date, as Chapter 228 did.

The enactment of Chapter 161 prompted Days Cove to file the instant lawsuit, claiming that Chapter 161, like its legislative predecessor, Chapter 228, is an unconstitutional special law. It further alleged, as it did with respect to Chapter 228, that Chapter 161 denies Days Cove due process and equal protection of the law and that it effectuates an unlawful taking of Days Cove's property. Granting Days Cove's motion for summary judgment, the Baltimore City circuit court held that Chapter 161 is invalid under Article III, § 33 of the Maryland Constitution because it is a prohibited special law.

---

4. Chapter 228, § 2 of the 2006 Maryland Laws contained a sunset provision providing that the Act *"shall remain effective through June 1, 2009, and, at the end of June 1, 2009, with no further action required by the General Assembly, . . . shall be abrogated and of no further force and effect."* (Emphasis in original.)

## DISCUSSION

Before proceeding any further, we believe that it would be helpful to first address the lens through which Days Cove views Chapter 161, a lens so narrow in focus that it distorts rather than enhances that provision of the law. Throughout its brief, Days Cove concentrates only on the application of Chapter 161 to Queen Anne's County, largely ignoring the application of the law to other parts of the State, namely, Prince George's County and, possibly, Charles and Kent Counties as well.[5] That focus is appropriate, maintains Days Cove, because, in applying the statute providing for severability of unconstitutional statutory provisions,[6] one can "properly sever[ ] the portion of the law dealing with the geographic area of Queen Anne's County, from the area of Prince George's County." Applying this approach, it contends that "there could be no serious contention that[, within Queen Anne's County, Chapter 161] applies, and can only apply, solely to Days Cove."

Days Cove then proceeds to misconstrue the circuit court's decision. Asserting that "the Circuit Court properly exercised its responsibility in analyzing and striking down as little of the

---

**5.** The MDE contends that Chapter 161 also applies to a small area in Kent County that lies within four miles of Unicorn Lake and a part of Charles County. Days Cove counters that, under a plain-language construction of Chapter 161, it has no application to Kent County and ignores whether it applies to any part of Charles County. Even if we assume, without deciding, that Days Cove is correct on that point, it is nonetheless beyond dispute that Chapter 161 expressly applies to Prince George's County. Thus, Chapter 161 applies to at least two widely separated regions of the State, and we need not further consider whether the legislation has any applicability to Kent County or Charles County.

**6.** Md.Code (1957, 2005 Repl.Vol.), Art. 1, § 23 provides as follows:

The provisions of all statutes enacted after July 1, 1973 are severable unless the statute specifically provides that its provisions are not severable. The finding by a court that some provision of a statute is unconstitutional and void does not affect the validity of the remaining portions of that statute, unless the court finds that the remaining valid provisions alone are incomplete and incapable of being executed in accordance with the legislative intent.

law as necessary," Days Cove claims that, because "the statute deals with distinct and separate subject matters and two distinct areas of the state, it was perfectly proper, ... [for] the Circuit Court to limit its analysis to the Days Cove application in Queen Anne's County, and to refrain from considering constitutional challenges to the statute as a whole[.]" But the circuit court's decision did much more than that, as it struck down the entire statute in all its applications. Although the circuit court initially suggested that it was only concerned with the application of Chapter 161 in Queen Anne's County, it nonetheless found the entire statute to be unconstitutional, declaring: "For the reasons cited above, the Court shall enter a Declaratory Judgment finding that Chapter 161 of the 2007 Acts of the General Assembly is an invalid special law in violation of Art. III, § 33 of the Maryland Constitution."

And Days Cove cites no authority for the proposition that, in construing a law applying to widely separated geographical regions, a court may first limit its focus to a single location, analyze the law's impact on that location only, without reference to the statute as a whole, and then declare the entire law to be unconstitutional, which was precisely what the court below did. Nor are we aware of any such authority.

The cases cited by Days Cove in support of its severability argument indicate that severance is permissible, but only after a judicial determination that the law in question is unconstitutional and that the constitutional portion of the measure can be salvaged by excising the offending section or phrase. *Reno v. American Civil Liberties Union,* 521 U.S. 844, 882–85, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (declining, with one narrow exception, to apply severability clause to facially overbroad Communications Decency Act of 1996 because Act was not "readily susceptible" to limiting construction); *Alaska Airlines v. Brock,* 480 U.S. 678, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) (holding that unconstitutional legislative-veto provision was severable from remaining parts of Airline Deregulation Act of 1978); *National Treasury Employees Union v. United States,* 990 F.2d 1271 (D.C.Cir.1993) (after invalidating honor-

arium ban in § 501(b) of the Ethics in Government Act on First Amendment grounds, Court of Appeals severed portion of statute covering Executive Branch only, leaving intact honorarium ban on members of Congress and judiciary), *rev'd in part on other grounds,* 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995); *Montrose Christian School v. Walsh,* 363 Md. 565, 770 A.2d 111 (2001) (severing facially unconstitutional religious exception from Montgomery County employment anti-discrimination ordinance); *Davis v. State,* 294 Md. 370, 451 A.2d 107 (1982) (severing unconstitutional religious group membership exception from statute mandating childhood immunization as condition of school enrollment). Hence, we must first consider Chapter 161 in its entirety and not just that part of the law that applies to Queen Anne's County.

## I.

Article III, § 33 of the Maryland Constitution, prohibits, in certain circumstances, "special laws," avowing: "And the General Assembly shall pass no special Law, for any case, for which provision has been made, by an existing General Law." [7] In other words, a law is constitutionally impermissible under § 33 if two conditions are met: (1) the law is a "special law" and (2) a "general law" relating to the same subject

---

7. The entire text of Article III, § 33 states as follows:

The General Assembly shall not pass local, or special Laws, in any of the following enumerated cases, viz.: For extending the time for the collection of taxes; granting divorces; changing the name of any person; providing for the sale of real estate, belonging to minors, or other persons laboring under legal disabilities, by executors, administrators, guardians or trustees; giving effect to informal, or invalid deeds or wills; refunding money paid into the State Treasury, or releasing persons from their debts, or obligations to the State, unless recommended by the Governor, or officers of the Treasury Department. And the General Assembly shall pass no special Law, for any case, for which provision has been made, by an existing General Law. The General Assembly, at its first Session after the adoption of this Constitution, shall pass General Laws, providing for the cases enumerated in this section, which are not already adequately provided for, and for all other cases, where a General Law can be made applicable.

matter already exists. *See Jones v. House of Reformation,* 176 Md. 43, 55–56, 3 A.2d 728 (1939).

■ What is the difference between a "special law" and a general law, for the purposes of § 33? "A special law is one that relates to particular persons or things of a class, as distinguished from a general law which applies to all persons or things of a class." *Prince George's County v. B. & O. R.R. Co.,* 113 Md. 179, 183, 77 A. 433 (1910).

■ "[I]n applying § 33 to determine whether an enactment affects less than an entire class and is, therefore, a 'special law,' [Maryland courts have] looked to the purpose of the constitutional prohibition." *Cities Serv. Co. v. Governor,* 290 Md. 553, 568, 431 A.2d 663 (1981). The purpose of § 33 is "to prevent one who has sufficient influence to secure legislation from getting an undue advantage over others" as well as to "prevent the dispensation or grants of special privileges to special interests, through the instrumentality of special legislation, in conflict with previously enacted general legislation covering the same subject matter." *Id.* at 568–69, 431 A.2d 663 (quotations and internal punctuation omitted).

In determining whether § 33 prohibits a particular piece of legislation, the Court of Appeals has "pointed to various considerations and factors, although certainly no one is conclusive in all cases." *Id.* at 569, 431 A.2d 663. Those "considerations and factors" include: "whether [the legislation] was actually intended to benefit or burden a particular member or members of a class instead of an entire class"; whether the legislation identifies particular individuals or entities; whether "a particular individual or business sought and received special advantages from the Legislature, or if other similar individuals or businesses were discriminated against by the legislation"; whether the legislation's substantive and practical effect, "and not merely its form," show that it singles out one individual or entity, from a general category, for special treatment; and whether "the legislatively drawn distinctions ... are arbitrary and without any reasonable basis." *Id.* at 569–70, 431 A.2d 663. One last "pertinent consideration[ ]" is

the public interest underlying the enactment, and the inadequacy of the general law to serve that interest. *Id.* at 570, 431 A.2d 663. We now apply the foregoing "considerations and factors" to the enactment of Chapter 161.

### Whether Chapter 161 Was Actually Intended to Benefit or Burden a Particular Member of a Class Instead of an Entire Class

■ The MDE contends that Chapter 161 is not a special law because it is not a "private Act[ ], for the relief of particular named parties, or providing for individual cases," *Montague v. State,* 54 Md. 481, 490 (1880), but rather, "broadly applies to any person who, now or in the future, would want to build or operate a landfill in the widespread geographic areas covered by the law." Days Cove counters that Chapter 161 is such a law inasmuch as it "creates a closed class of one," namely Days Cove, and there is a general law "dealing with the asserted public interest in this case, the protection of the environment."

In support of its "closed-class-of-one" claim, Days Cove asserts that Chapter 161 applies only to it because Chapter 161 cannot now or in the future apply to anyone else, reasoning that, because Queen Anne's County amended its zoning laws in 2004 to prohibit the issuance of a conditional use for rubble landfills anywhere in the county and because, under Maryland Code (1982, 2007 Repl.Vol.), EN § 9–210(a)(3), the MDE is prohibited from issuing a permit to install or modify such a facility unless it complies with county zoning laws, "[t]here will be no other permit applicants [for rubble landfills] anywhere" in Queen Anne's County in the future. And, since Days Cove had the only pending application for a rubble landfill in the affected area, the "practical effect" of Chapter 161, concludes Days Cove, is to burden only it.

In addressing Days Cove's "closed-class-of-one" argument, we find *Potomac Sand & Gravel Co. v. Governor of Md.,* 266 Md. 358, 293 A.2d 241 (1972) (per curiam), particularly pertinent. In that case, the Court of Appeals held that a public local law, Chapter 792 of the 1971 Laws of Maryland, prevent-

ing anyone from dredging certain specified wetlands in Charles County, was not a special law.[8]

Potomac Sand and Gravel Company, which was engaged in the business of dredging sand and gravel deposits found in land that it owned and from the beds of tidal waters surrounding that land, was the only entity then affected by the dredging ban. It brought a declaratory judgment action claiming, among other things, that Chapter 792, which did not apply to neighboring counties, denied it equal protection of the laws and was violative of Article III, § 33.

In rejecting Potomac Sand's claim, the Court reasoned that, although only one entity was immediately affected by the law, the prohibition on dredging was applicable to "others," that is, anyone who might wish to engage in the prohibited activity. The Court of Appeals explained:

> [The dredging prohibition] does not provide relief of a particular named party. It is true that Potomac Company may be the only party affected by [the law], but if others wished to dredge the wetlands of Charles County, they too would be prohibited from doing so. [The dredging prohibition] is applicable to all persons, but is limited to Charles County because the wetlands sought to be protected ... are located in Charles County.

*Id.* at 379, 293 A.2d 241.

Thus, the *Potomac Sand* Court flatly rejected a "closed-class-of-one" claim very similar to the one before us, leading us to conclude that, because others who may wish to establish a rubble landfill within the defined areas in Queen Anne's and Prince George's Counties would be prohibited from doing so, Chapter 161, likewise, "is applicable to all persons, but is limited to [Queen Anne's and Prince George's Counties] be-

---

8. Chapter 792 of the 1971 Laws of Maryland stated in relevant part: "It shall be unlawful to dredge for sand, gravel or other aggregates or minerals, in any of the tidal waters or marshlands of Charles County, providing that this section shall not conflict with any necessary channel dredging operation for the purposes of navigation." *Potomac Sand,* 266 Md. at 361, 293 A.2d 241.

cause the wetlands sought to be protected . . . are located in [those counties]." *Id.*

Furthermore, the three out-of-state cases cited by Days Cove—*City of Springfield v. Sprint Spectrum, L.P.*, 203 S.W.3d 177 (Mo.2006); *Harrisburg School District v. Hickok*, 563 Pa. 391, 761 A.2d 1132 (2000); and *Pennsylvania Turnpike Commission v. Pennsylvania*, 587 Pa. 347, 899 A.2d 1085 (2006)—to support its "closed-class-of-one" argument are not applicable here.

In *City of Springfield v. Sprint Spectrum, L.P.*, 203 S.W.3d 177, the Supreme Court of Missouri considered the constitutionality, under a Missouri provision similar to Article III, § 33, of a statutory scheme that exempted certain municipalities from a statewide limit on their authority to impose business license taxes on phone companies. Only those municipalities that had already "taken affirmative action to collect" such a tax prior to January 15, 2005, were exempt from the limitations. Because the statute setting forth the cutoff date was enacted after January 15, 2005, and had an effective date of August 28, 2005, "the class of cities that could come within this exemption was fixed, based on an immutable, historical fact: whether an ordinance meeting the specifications of [the statute] had or had not already been passed and enforced by the city prior to January 15, 2005." *Id.* at 185. Consequently, the Court held that the statute was a special law.

Unlike the instant case, in *Sprint Spectrum*, where the class was closed because it was "based on an immutable, historical fact," *id.* at 185, here, the class of persons and organizations covered by Chapter 161 is open, because the statute operates prospectively to prevent the Secretary of the MDE from issuing a permit to anyone in the future who wishes to establish a rubble landfill in the affected areas.

In *Harrisburg School District v. Hickok*, 563 Pa. 391, 761 A.2d 1132 (2000), the Supreme Court of Pennsylvania considered whether a provision of a state law, the Education Empowerment Act of 2000, was a special law under that state's

analogue to Article III, § 33. In general, the Education Empowerment Act provided for state control over school districts having a history of low test scores. The challenged provision established an exception to this general scheme: "If a school district is 'a school district of the second class with a history of low test performance which is coterminous with the city of the third class which contains the permanent seat of government,' i.e., if the school district is located in Harrisburg, the secretary is directed not to include the district on the list of schools with low performance, but to immediately certify the district as an 'education empowerment district,'" which would remain under local, rather than state, control. *Id.* at 1135. The Court held that the provision was a special law.

As the Supreme Court of Pennsylvania explained, the class created by the Education Empowerment Act of 2000, although defined obtusely through a maze of jargon, was actually a closed class of one consisting of the state capital, Harrisburg. *Id.* Thus, *Hickok* is unlike the present case because the class defined by Chapter 161 is open.

In *Pennsylvania Turnpike Commission v. Pennsylvania*, 587 Pa. 347, 899 A.2d 1085 (2006), the Supreme Court of Pennsylvania addressed whether the First–Level Supervisor Collective Bargaining Act, which mandated that the Pennsylvania Turnpike Commission collectively bargain with its first-level supervisors,[9] was a special law. After noting that the statute, as originally introduced in the legislature, was intended to apply broadly to public employers, 899 A.2d at 1087, the Court invalidated it because, among other reasons, the statute "created a class with one member and did so in a fashion that makes it impossible for another member to join the class," since it "defined 'public employer' as 'The Pennsylvania Turnpike Commission.'" *Id.* at 1098. Thus, *Pennsylvania Turnpike Commission* also differs materially from the instant case.

---

9. "First-level" was statutorily defined as "the lowest level at which an employee functions as a supervisor." 43 Pa.Stat. § 1101.301(19).

As to Days Cove's claim that the legislative intent underlying Chapter 161 was to impose a burden only on it, Days Cove relies on what it calls "the history of this legislation," pointing first to the legislative testimony of the bill's sponsor and others regarding the necessity of Chapter 161, then to the lack of testimony concerning other landfills in Queen Anne's or Prince George's Counties, and, finally, to an "analysis of [Chapter 161] [that] refers to one and only one proposed facility: the Days Cove facility near Unicorn Lake." It concludes: "To claim that Chapter 161 is targeted at any facility other than the Days Cove proposal simply belies the record set out before the General Assembly at the time of enactment."

It appears that Days Cove is asking us to discern some illicit motive on the part of the General Assembly from the legislative testimony presented in favor of Chapter 161. This is not, however, a proper line of inquiry for this Court. As we stated in *Pack Shack, Inc. v. Howard County*, 138 Md.App. 59, 72, 770 A.2d 1028 (2001): "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." We explained: "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *Id.*

Indeed, "[i]t is well-settled that when the judiciary reviews a statute or other governmental enactment, either for validity or to determine the legal effect of the enactment in a particular situation, the judiciary is ordinarily not concerned with whatever may have motivated the legislative body or other governmental actor." *Workers' Comp. Comm'n v. Driver*, 336 Md. 105, 118, 647 A.2d 96 (1994). Thus, legislative testimony is largely irrelevant with respect to a determination as to whether Chapter 161 is a special law. And, for this reason, we attach no significance to the fact that no other landfill facility was mentioned in legislative testimony or an "analysis" of the bill. Moreover, the focus of testimony and

analysis was on Days Cove simply because there was no other entity actively planning, at that time, to construct a landfill in any of the areas covered by Chapter 161.[10]

Nor are we persuaded that the 2004 amendment to the zoning ordinance of Queen Anne's County, which purportedly excludes rubble landfills as a conditional use in the county, affects the constitutionality of Chapter 161. Days Cove cites no authority for the proposition that a local ordinance can invalidate an otherwise constitutional state statute.

### Whether Chapter 161 Identifies Particular Individuals or Entities

If an act expressly states that it applies only to a particular, named individual or entity, it may run afoul of Article III, § 33. So may "equivalent" means of identifying a particular entity. *Reyes v. Prince George's County,* 281 Md. 279, 305–06, 380 A.2d 12 (1977). Days Cove asserts that "it is clear that Chapter 161 could apply only to Days Cove in Queen Anne's County." Thus, it contends, Chapter 161 is a special law despite its failure to expressly name a particular entity.

In *Reyes,* however, the Court of Appeals concluded that an act authorizing Prince George's County to sell bonds to acquire "any sports stadium or sports arena" in the county was not a special law, even though only one arena, the former Capital Centre, existed in the county at the time. It was not a special law, explained the Court, because "if the county wishes to acquire or finance other sports facilities in the county, it may do so." *Id.* at 306, 380 A.2d 12. On the other hand, "had [the law] specifically identified the arena by name or in any equivalent manner," the Court acknowledged, "it might well have been a special law." *Id.* at 305–06, 380 A.2d 12. But since it, instead, "referred to sports arenas or sports stadia no

---

10. According to appellants, there is an "inactive application" for a landfill permit pending in Prince George's County for a location also covered under Chapter 161.

matter where located in the county, any facility meeting this definition fell within its ambit." *Id.* at 306, 380 A.2d 12.

Moreover, as noted earlier, *Potomac Sand* held that Chapter 792 of the 1971 Laws of Maryland, though it applied only to a single entity at the time of its enactment, was not a special law because it was "applicable to all persons" in the affected county. 266 Md. at 379, 293 A.2d 241.

Finally, *Beauchamp v. Somerset County,* 256 Md. 541, 261 A.2d 461, *supra,* provides an instructive contrast to *Reyes, Potomac Sand,* and, for that matter, to the instant case. In *Beauchamp,* the Court of Appeals held that Chapter 674 of the Laws of 1966 was a special law as to a matter already covered by a public general law. That law provided as follows:

> "Notwithstanding any requirements of the subtitle to the contrary, in Somerset County, an incorporated American Legion Post is exempted from payment of any taxes ... levied against the property of any such Post by the Somerset County Sanitary District, Inc[.]"

256 Md. at 546, 261 A.2d 461 (italics omitted). In so holding, the Court noted that, although no entity was specifically named, the practical effect of the tax exemption was to benefit only one Post, American Legion Post No. 94:

> The facts in this case ... indicate that although the Sanitary Commission has county-wide authority, it has established only one sub-district ... in which the lands of American Legion Post No. 94 are located and it is the only American Legion Post in the sub-district.... It is thus seen that the practical effect and the effect intended by the sponsors of the Act was to exempt American Legion Post No. 94 from any assessment or charge by the Sanitary Commission. The Act thus, in effect, applies to one taxpayer only and to the lands of that one taxpayer.

*Id.* at 549, 261 A.2d 461 (emphasis omitted). *Beauchamp* thus exemplifies a special law that identifies "in an[ ] equivalent manner" a particular beneficiary, American Legion Post No. 94. *Reyes,* 281 Md. at 305, 380 A.2d 12.

The instant case is more like *Reyes* and *Potomac Sand* than *Beauchamp.* Here, the legislation applies not only to Days Cove, or even to any person or entity that, in the future, might wish to construct a rubble landfill within four miles of Unicorn Lake in Queen Anne's County, but also to designated parts of Prince George's County. Indeed, even "laws affecting only a single entity have been upheld where they can apply, in principle, to other similarly situated entities." *State v. Burning Tree Club, Inc.,* 315 Md. 254, 275, 554 A.2d 366 (1989), citing *Reyes* and *Potomac Sand.* Chapter 161 clearly "appl[ies], in principle, to other similarly situated entities," that is, to anyone else who might, in the future, wish to establish or operate a rubble landfill in the areas prohibited by Chapter 161, and does not identify a particular entity "in an[ ] equivalent manner."

### Whether a Particular Entity Sought and Received Special Advantages from the Legislature, or Other Similar Entities Were Discriminated Against by Chapter 161

Days Cove contends that "the Legislature, by the passage of Chapter 161, intended to burden [it] in particular, and was not acting to limit the entire class of landfill operators in order to protect natural areas." The MDE counters that there is "no indication that any individual or business sought or received special advantages from the [L]egislature with respect to Chapter 161."

Chapter 161 is not expressly or impliedly intended to benefit or burden Days Cove alone. As the MDE points out, Chapter 161 lacks any exceptions or date limitations that would allow one or more competitors to do what is denied to Days Cove. Chapter 161 has broad application, covering any and all persons or entities interested in building and operating a rubble landfill in the defined geographical regions. And, although Chapter 161 may immediately affect only Days Cove's pending permit application, that fact alone, as we have observed, is not sufficient to render it a special law. *See Reyes,* 281 Md. at 306, 380 A.2d 12; *Potomac Sand,* 266 Md. at 379, 293 A.2d 241.

Unable to name anyone else who has sought and received a special advantage as a result of the enactment of Chapter 161, Days Cove points only to itself, insisting that the Legislature unfairly singled it out for special treatment. This argument was largely addressed in a previous section in which we considered Days Cove's "closed-class-of-one" argument. But we will nonetheless address the applicability of *Cities Service*, *supra*, upon which Days Cove relies in support of this claim, because, as we shall see, that case, in fact, significantly undermines Days Cove's position.

Days Cove's reliance upon *Cities Service* is misplaced. In *Cities Service*, the Court of Appeals examined a "mass merchandiser exemption" to the Divestiture Law,[11] which prohibits producers or refiners of petroleum products from operating any retail service station in Maryland with company personnel or through a subsidiary company. *Cities Serv.*, 290 Md. at 555–57, 431 A.2d 663. To fall within the exemption, a mass merchandiser must have been operating a retail service station as of January 1, 1979; must have been a subsidiary of a petroleum producer or refiner as of that same date; and must have derived less than two percent of its gross revenues from all Maryland retail operations as the result of the sale of petroleum products in Maryland. *Id.* at 557, 431 A.2d 663.

At the time of its enactment, the exemption applied to only one subsidiary in Maryland, the now-defunct Montgomery Ward and Company, Inc., which actively sought that benefit.[12] *Id.* at 570–71, 431 A.2d 663. Because the exemption applied only to a mass merchandiser that already was an oil company subsidiary as of January 1, 1979, and that already had been operating a retail service station as of that date, the class

---

**11.** At the time *Cities Service* was decided, the Divestiture Law was codified at Md.Code (1957, 1979 Repl.Vol., 1980 Cum.Supp.), Art. 56, § 157E. A similar provision now is codified at Md.Code (1992, 2010 Repl.Vol.), § 10–311 of the Business Regulation Article.

**12.** At the time, Montgomery Ward was a subsidiary of Mobil Corporation. More recently, Mobil has merged with Exxon to form Exxon Mobil Corporation.

created by the exemption was closed to any subsidiary subsequently created or acquired by any petroleum producer or refiner. *Id.* at 571, 431 A.2d 663. Thus, "the effect of the January 1, 1979, qualifying dates [was] virtually the same as if the statute had named Montgomery Ward." *Id.* The Court concluded that "[t]he qualifying dates [were], in the language of the *Reyes* case, the 'equivalent manner' of identifying" Montgomery Ward, the one and only intended beneficiary of the exemption, which therefore was a "special law." *Id.* at 571, 431 A.2d 663. In rejecting the argument that the special law was nonetheless constitutional, the Court further pointed out that the existing "general law did make provision for the same subject matter as the 1979 mass merchandiser amendment." *Id.* at 574, 431 A.2d 663.

Thereafter, even though it was clear that only one subsidiary, at that time, benefitted from the exemption, the Court salvaged most of the mass merchandiser exception by severing and removing the qualifying dates, *id.* at 577, 431 A.2d 663, explaining:

> The present case would be like *Reyes[, supra,]* except for the January 1, 1979, qualifying dates. With those dates deleted, Montgomery Ward would still be the only present beneficiary of the mass merchandiser exemption. Nevertheless, if another retail mass merchandiser selling gasoline became a subsidiary of a producer or refiner after it began the sale of gasoline, it also would qualify under the statute.

*Id.* at 571, 431 A.2d 663.

Here, unlike the "mass merchandiser exemption" in *Cities Service,* Chapter 161 does not contain any qualifying or grandfather dates that are the equivalent of specifically identifying Days Cove's proposed rubble landfill. As the Court of Appeals observed, "Montgomery Ward [was] the only subsidiary of a producer or refiner which [could have] qualif[ied]," then or in the future. *Id.* And finally, in contrast to what occurred in the instant case, in *Cities Service,* "the Legislature was advised that one business," Montgomery Ward, "was the sole beneficiary." *Id.* at 570, 431 A.2d 663.

Chapter 161 prevents the Secretary of the MDE from issuing a permit to anyone, either now or in the future, who wishes to construct or operate a rubble landfill in areas protected by the law. And, simply because Chapter 161 immediately affects only one entity, that fact alone does not render it a special law. Hence, *Cities Service* demonstrates, not that Chapter 161 is a special law, as Days Cove claims, but that it is not such a law.

## Whether Chapter 161's Substantive and Practical Effects Single Out a Particular Person or Entity, from a General Category, for Special Treatment; and Whether the Distinctions Drawn by Chapter 161 Are Arbitrary and Without Any Reasonable Basis

Blending these two factors, Days Cove claims that Chapter 161 is a special law because "the substance and practical effect of Chapter 161 [have] no rational relationship to any environmental threats posed by landfills," pointing out that appellants have offered no evidence to support the proposition that "Chapter 161 protects important natural areas from environmental threats posed by landfills." It dismisses, moreover, the MDE's assertion that Chapter 161 is now necessary to protect important natural areas from environmental threats by describing that assertion as "akin to a legislative enactment declaring the earth to being the center of the universe." And it further claims that the MDE opposed "similar legislation" that preceded Chapter 161 because the MDE believed, in the words of Days Cove, that "its regulations are completely sufficient to protect the public health and environment with respect to the Days Cove rubblefill or any other similar facility."

As to Days Cove's geocentric attack, we simply cannot say that the MDE's assertion that Chapter 161 "protect[s] important natural areas from the environmental threats posed by landfills" is without a rational basis. We are not in a position to assume that, under any circumstances, a rubble landfill, even if well-constructed, would never leak contaminants into nearby ground and surface waters, and Chapter 161 is intend-

ed to prevent such an occurrence within a targeted area. That Chapter 161 targets a limited area does not render it arbitrary or unreasonable, since " 'territorial uniformity is not a constitutional prerequisite.' " *Potomac Sand, supra,* 266 Md. at 377, 293 A.2d 241 (quoting *McGowan v. Maryland,* 366 U.S. 420, 427, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)).

As the MDE points out, "the substance and practical effect of Chapter 161 ... ensure that *no* person may build or operate a landfill in the covered areas." At the present time, this law, we know, affects Days Cove, but it also affects *anyone* that may wish to build and operate a landfill in the areas covered by the law. Merely because those persons or entities are not susceptible of enumeration does not mean that Chapter 161 has no effect on them.

Furthermore, the fact that Chapter 161 affects only a limited, defined geographic region does not make it a special law. As we have seen, the Court of Appeals rejected a similar argument in *Potomac Sand, supra,* 266 Md. at 378–79, 293 A.2d 241, in upholding a targeted environmental protection statute.

Days Cove contends that it was the MDE's position, before the enactment of Chapter 161, that "its regulations [were] completely sufficient to protect the public health and environment." Even if Days Cove were correct, the MDE's change in position is evidence that decision makers at the MDE changed their minds, not that Chapter 161 must, because of that fact, be a special law.

Days Cove also asks this Court to "take notice of the fact that the legislatively drawn distinctions, prohibiting a rubble-fill within four miles of Unicorn Lake in Queen Anne's County, and certain areas of Prince George's County, are arbitrary and without any reasonable basis." Relying on the purported "comprehensiveness" of Title 9 of the Environment Article, Days Cove insists: Chapter 161 "simply singles out specific areas, and states, that whatever the scientific and environmental evidence established during [the established permit review

process], that evidence should be ignored, even where it clearly supports the issuance of a permit."

As noted above, because Chapter 161 is not a special law, we are not, here, concerned with the comprehensiveness of the permitting process set forth in Title 9 of the Environment Article.

As to Days Cove's contention that Chapter 161 is a special law because it draws arbitrary distinctions, we note that, although Days Cove has not cited any authority for that proposition, there is some precedent supporting that view. In *Littleton v. Hagerstown*, 150 Md. 163, 132 A. 773 (1926), in addressing a § 33 challenge, the Court of Appeals held that "[a] statutory classification not grounded on any reasonable or practical necessity, and which effectuates an evasion of the constitution, will not be upheld." *Id.* at 176, 132 A. 773 (citation and quotation omitted). In that case, the Court thus weighed the lack of a reasonable basis for the statutory classification as confirming its view that the statute at issue was a special law.[13] *Id.* at 179–81, 132 A. 773.

The case at bar is clearly distinguishable, however. As previously explained, there is a straightforward rational basis supporting Chapter 161: targeted environmental protection.[14]

---

**13.** Thus, this factor overlaps to a considerable degree the question whether a challenged law satisfies the rational basis test under an equal protection theory. Although the Court of Appeals has never held that § 33 and Article 24 of the Maryland Declaration of Rights (equal protection/due process) are coterminous in this regard, the Court has noted in dicta that the questions are closely related. *See, e.g., Potomac Sand, supra,* 266 Md. at 378, 293 A.2d 241 ("Related to Potomac Company's equal protection argument is its assertion that Chapter 792 is a special law on a subject for which general legislation has been enacted and, therefore violates Article III, sec. 33 of the Constitution of Maryland."). We further note that the Supreme Court of Pennsylvania has interpreted that state's analogue to § 33 "under the same jurisprudential rubric" as equal protection. *Pennsylvania Turnpike Commission v. Pennsylvania,* 587 Pa. 347, 899 A.2d 1085, 1094 (2006).

**14.** We further note that, under rational basis review of an equal protection challenge, "if any state of facts reasonably can be conceived that would sustain [a challenged legislative classification], the existence of that state of facts at the time the law was enacted must be assumed."

Indeed, the instant case is on all fours with *Potomac Sand, supra,* 266 Md. at 378, 293 A.2d 241, which upheld a similarly targeted environmental protection statute despite the prior existence of a generally applicable permitting process. Therefore, we reject Days Cove's contention that the General Assembly's decision to protect only specified waterways in Queen Anne's and Prince George's Counties is arbitrary.

### The Public Interest Underlying Chapter 161, and the Inadequacy of the General Law to Serve That Interest

Finally, Days Cove asserts that Chapter 161 "does not serve any valid public need or interest," opining that "there is a general law dealing with the asserted public interest in this case, the protection of the environment, that general law being completely adequate to serve the public need and public interest asserted by [appellants]." It points specifically to "Title 9 of the Environment Article[ ] and [the] COMAR Regulations enacted pursuant to that title[,]" which, according to Days Cove, already "set out a comprehensive and detailed three phase process that reviews all aspects of a proposed rubblefill for its [e]ffects on the environment and any potential impact on public health and safety."

Although Days Cove cites authority for the purported comprehensiveness of Title 9 of the Environment Article, it cites no authority for the proposition that an existing statutory scheme, which at the time of enactment was comprehensive, automatically transforms any subsequent law, like Chapter 161, into a special law. As noted, Article III, § 33 prohibits the passage of a special law on a matter "for which provision has been made, by an existing General Law." Thus, although the existence of a general law is relevant to the determination of whether a subsequently enacted *special* law is unconstitutional, it is not necessarily dispositive of that impermissibility

*Montgomery County v. Fields Road Corp.,* 282 Md. 575, 580, 386 A.2d 344 (1978) (quoting *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911)).

if the general law fails to address a specific problem, as does Chapter 161. *Norris v. Mayor & City Council of Baltimore*, 172 Md. 667, 192 A. 531 (1937), illustrates this point.

For example, in *Norris*, the Court of Appeals determined that an act of the General Assembly directing the purchase and use of certain voting machines in Baltimore City was not a special law, but an adaptation of an existing general law. The Court compared the challenged law to the pre-existing election law scheme, noting that, while the "Public General Laws of the State undoubtedly do provide for the time, the place, and the manner of holding elections in this [S]tate[,] [and] those laws are general in their nature, they are by no means uniform in their regulation of the conduct of such elections in the several political subdivisions of the [S]tate." *Id.* at 684, 192 A. 531. The Court determined that the challenged law was not a special law, explaining:

> Since the statute under consideration in this case does no more than provide a method of voting in Baltimore City, which in the judgment of the Legislature is peculiarly adapted to the needs of that particular locality, and, because of conditions there, is more likely to prevent fraud and insure secrecy in voting than the method provided for other parts of the state, it is not a special law, but merely an adaptation of the general law to the needs and conditions of a particular locality. For "while a statute which is applicable to all of the people of the state and which operates in all of the state is general in its character, it is not necessary that a law, in order to be general, shall affect all of the people of the state, or all of the state, nor need it include all classes of individuals; it may be intended to operate over a limited number of persons or things, or within a limited territory, and if every person or locality brought within the relations and circumstances provided by the law is affected, the law may be general although presently operative on but a single individual, or thing, place, or political subdivision, such as a county or municipal corporation, and its general character is not affected by the number of persons, things,

or localities which come within the scope of its operation." 59 *C.J.* 730.

*Id.* at 685–86, 192 A. 531.

Among other things, the Court held that a law that operates only "within a limited territory" or even "on but a single individual, or thing, place, or political subdivision" is not *necessarily* a special law. *Id.* In other words, the mere fact that the legislature enacts "an adaptation of the general law to the needs and conditions of a particular locality" does not implicate the strictures of § 33. *Id.* at 685, 192 A. 531.

Furthermore, even some special laws, as the Court of Appeals has explained, do not fall within the constitutional prohibition, provided that the legislation addresses "special evils with which existing general laws are incompetent to cope." *Jones, supra,* 176 Md. at 58, 3 A.2d 728 (quoting *Williams v. Baltimore,* 289 U.S. 36, 46, 53 S.Ct. 431, 77 L.Ed. 1015 (1933)). In *Jones,* the Court held that a statute expressly exempting the employees of a specific juvenile detention facility from an otherwise mandatory state employment test did not violate § 33. *Id.* at 59, 3 A.2d 728. In so doing, the Court commented:

"There has been need, now and again, to develop close distinctions. Our endeavor in what follows is to extract the essence of the decisions and to give effect to it as law. Time with its tides brings new conditions which must be cared for by new laws. Sometimes the new conditions affect the members of a class. If so, the correcting statute must apply to all alike. Sometimes the new conditions affect one only or a few. If so, the correcting statute may be as narrow as the mischief."

*Id.* at 57–58, 3 A.2d 728 (quoting *Williams v. Baltimore,* 289 U.S. 36, 45–46, 53 S.Ct. 431, 77 L.Ed. 1015 (1933)). Jones thus held that even if a law is special, it is allowed if it is tailored to meet "new conditions." *Id.* at 57, 3 A.2d 728.

As in *Norris,* Chapter 161 is "an adaptation of the general law to the needs and conditions of a particular locality," Unicorn Lake. 172 Md. at 685, 192 A. 531. As in *Jones,*

Chapter 161 is tailored to meet "new conditions" and "special evils," 176 Md. at 57–58, 3 A.2d 728, namely, the environmental threat posed by Days Cove's proposed rubble landfill, which could leak contaminants into Unicorn Lake and the Chester River. In sum, we reject Days Cove's argument that Chapter 161 serves no valid public need or interest. We are unpersuaded that the comprehensiveness of Title 9 of the Environment Article somehow transforms Chapter 161 into a prohibited special law, and, even if it were deemed a special law (a view that we reject), it would still be constitutionally permissible under the rationale of *Jones.*

## II.

The MDE also claims that Chapter 161 does not deny Days Cove equal protection or due process of the law or effect an unlawful taking of Days Cove's property. Citing *Conaway v. Deane,* 401 Md. 219, 243–44, 932 A.2d 571 (2007), the MDE asks us to decide those issues even though, in granting Days Cove summary judgment, the circuit court did not.

In *Conaway,* the Court of Appeals observed:

" 'Maryland appellate courts, as a general rule, will consider only the [legal] grounds upon which the [trial] court relied in granting summary judgment.' " *Ross v. State Bd. of Elections,* 387 Md. 649, 667, 876 A.2d 692, 702 (2005) (quoting *Eid v. Duke,* 373 Md. 2, 10, 816 A.2d 844, 849 (2003)). . . . This premise is only valid, however, when "there are two or more separate and distinct grounds for the grant of summary judgment, and the trial court relies on one, but not another, in granting summary judgment." *Ross,* 387 Md. at 667, 876 A.2d at 702–03. Thus, if two or more similar and "inextricably intertwined" grounds for summary judgment exist, this Court may consider alternatively any related ground, if raised properly by the litigant in his, her, or its motion for summary judgment, if we find fault with the ground relied upon facially by the trial court. *Id.*

*Conaway,* 401 Md. at 243–44, 932 A.2d 571.

The special law claim on which the circuit court incorrectly granted Days Cove summary judgment is "inextricably inter-

twined" with its due process and equal protection claims. As noted by the Court of Appeals, due process and equal protection claims focus on whether the legislatively drawn classifications satisfy the rational basis test,[15] whereas the special law claim addresses the largely overlapping question whether the "legislatively drawn distinctions . . . are arbitrary and without any reasonable basis." *Cities Serv., supra,* 290 Md. at 570, 431 A.2d 663. *See also Potomac Sand, supra,* 266 Md. at 378, 293 A.2d 241 ("Related to Potomac Company's equal protection argument is its assertion that Chapter 792 is a special law on a subject for which general legislation has been enacted and, therefore violates Article III, sec. 33 of the Constitution of Maryland.").

The close relationship between the due process and equal protection claims, on the one hand, and the special law claim, on the other, is conceded in Days Cove's brief, where it asserts:

> Appellant claims that Chapter 161 does not violate the equal protection or due process challenges because the law serves a valid public need or interest not already served by the prior general law, and the distinctions drawn by it are neither arbitrary [n]or without reasonable basis. Thus, according to Appellant[ ], it meets the requirements of rational basis analysis. For the reasons previously discussed concerning Chapter 161, Days Cove strongly disputes these contentions. **As set out earlier in the brief [i.e., in the section addressing the special law claim], and**

---

**15.** There is no contention by either side that a suspect classification or fundamental right is involved, and, therefore, heightened scrutiny does not apply in the instant case. *See, e.g., Tyler v. City of College Park,* 415 Md. 475, 501, 3 A.3d 421 (2010). Moreover, "[w]here, as here, the legislative action at issue neither interferes with a fundamental right nor implicates a suspect classification, the test for determining whether a statute violates the equal protection component of Article 24 is nearly identical to the due process examination." *Id.* Thus, we address equal protection and due process together.

**without repeating the same analysis, there is no rational basis for Chapter 161.**

(Appellee's Brief at 30–31) (emphasis added).

 As to the substance of Days Cove's equal protection and due process claims, however, those claims have no merit, for the same reason explained previously in the context of Art. III, § 33: there is a rational basis underlying Chapter 161, namely, environmental protection. Although, as Days Cove insists, Chapter 161 "singles out specific areas" and does not apply throughout the State, that is of no consequence, because "a classification having a reasonable basis does not offend equal protection [or due process] merely because it is not made with 'mathematical nicety' or because in practice it results in some inequality." *Tyler v. City of College Park,* 415 Md. 475, 501, 3 A.3d 421 (2010); *Conaway,* 401 Md. at 275, 932 A.2d 571. Moreover, "legislative bodies are not required ... to attack all aspects of a problem at the same time; rather, the legislative body 'may select one phase of a problem and apply a remedy there, neglecting for the moment other phases of the problem.'" *Tyler,* 415 Md. at 501, 3 A.3d 421 (quoting *Bowie Inn, Inc. v. City of Bowie,* 274 Md. 230, 241, 335 A.2d 679 (1975)).

It appears that, in enacting Chapter 161, the General Assembly has likewise selected "one phase" of the water pollution problem and applied a focused remedy. As the *Potomac Sand* Court explained under similar circumstances involving a comparable challenge to Chapter 792 of the 1971 Laws of Maryland, a targeted environmental protection statute:

> Chapter 792 has an ecological purpose. As has been shown, the protection of exhaustible natural resources is a valid exercise of the police powers. The prohibition of anyone from dredging sand, gravel or other aggregates or minerals in the wetlands of Charles County is a rational regulation in light of the potential and real harm caused by dredging[.]

266 Md. at 377, 293 A.2d 241.

Similarly, Chapter 161 has an ecological purpose, is plainly within the legitimate police powers of the State, and, thus, "is

rationally related to a legitimate governmental interest," *Tyler*, 415 Md. at 501, 3 A.3d 421, that is, preventing anyone from establishing or operating a rubble landfill within close proximity to waterways in Queen Anne's and Prince George's Counties and, possibly, Charles and Kent Counties, given the potential harm that might be caused by possible leakage of contaminants into environmentally sensitive wetlands and waterways.

As to Days Cove's taking claim, however, we must remand to the circuit court, for two reasons: that claim is not "inextricably intertwined" with the special law claim on which the court below based its decision, and thus, the *Conaway* exception does not apply; and the taking claim is not a pure question of law but, rather, is heavily dependent on factual findings that the circuit court, understandably, believed were unnecessary, given its holding that Chapter 161 was a special law.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY DAYS COVE RECLAMATION COMPANY.**

