81 A.3d 528

CCI ENTERTAINMENT, LLC t/a Crooked
I Sports Bar & Grill et al.

v.

STATE of Maryland et al.

No. 766, Sept. Term, 2012.

Court of Special Appeals of Maryland.

Dec. 18, 2013.

Ronald H. Jarashow (Jonathan P. Kagan, Baldwin, Kagan & Gormley, LLC, on the brief), Annapolis, MD, for Appellant.

Julie D. Bernhardt (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: WOODWARD, KEHOE, JAMES P. SALMON (Retired, Specially Assigned), JJ.

KEHOE, J.

The primary dispute in this case is whether a 2012 amendment to the State's gaming law violates the Maryland constitutional prohibition against "special laws."[1] We hold that it

---

1. Maryland Constitution Article III, § 33 states (emphasis added):
 The General Assembly shall not pass local, or special Laws, in any of the following enumerated cases, viz.: For extending the time for the

does not. The appellants/cross-appellees are CCI Entertainment, L.L.C., trading as the Crooked I Sports Bar & Grill, which operated a gaming establishment in Calvert County, and its principals (collectively "CCI").[2] The appellees/cross-appellants are the State, Governor Martin O'Malley, the General Assembly, and the State's Attorney for Calvert County (collectively, "the State").

At issue is chapter 603 of the Acts of 2012, which, among other things, amended the statutory definition of "slot machine" in ways that rendered unquestionably illegal the gaming machines that CCI asserts had been legal up to that time. CCI contends that § 3 of chapter 603 is a "grandfather" provision that exempted a small number of existing entities—but not it—from the effect of the amendments. CCI argues that it should have been included within this class of grandfathered businesses and that chapter 603 was deliberately and specifically drafted to exclude it.

CCI filed suit in the Circuit Court for Anne Arundel County against the State seeking declaratory and injunctive relief. Pertinent to this appeal, CCI alleged that: 1) § 3 of chapter 603 is a "special law" and violates Article III, § 33 of the Maryland Constitution; 2) the same provision offends equal protection principles by treating CCI differently from similarly-situated businesses without any legitimate, rational basis;

---

collection of taxes; granting divorces; changing the name of any person; providing for the sale of real estate, belonging to minors, or other persons laboring under legal disabilities, by executors, administrators, guardians or trustees; giving effect to informal, or invalid deeds or wills; refunding money paid into the State Treasury, or releasing persons from their debts, or obligations to the State, unless recommended by the Governor, or officers of the Treasury Department. **And the General Assembly shall pass no special Law, for any case, for which provision has been made, by an existing General Law.** The General Assembly, at its first Session after the adoption of this Constitution, shall pass General Laws, providing for the cases enumerated in this section, which are not already adequately provided for, and for all other cases, where a General Law can be made applicable.

**2.** The owners of CCI are Ryan Hill, Christopher Russell, Chris Chubb, and Rick Crump.

and 3) chapter 603, when applied to it, constitutes an unconstitutional taking of CCI's property. The State contested all of these allegations.

In discovery, CCI sought to obtain documents and emails in the possession of the General Assembly related to the drafting and consideration of Senate Bill 864, which, when enacted, became chapter 603. The circuit court ordered the General Assembly to disclose certain documents for *in camera* review, and denied CCI's remaining discovery requests. The State filed an interlocutory appeal of this order. CCI asserts that the circuit court erred in restricting its ability to obtain the discovery it requested. The State contends that the circuit court's order compelling the General Assembly to disclose documents for *in camera* review violated "the State's sovereign immunity, the speech and debate clause, and the absolute legislative privilege of the General Assembly and its members."

After an evidentiary hearing, the court denied CCI's request for a preliminary injunction. The parties then stipulated to an order consolidating the preliminary injunction proceedings with a trial on the merits and the circuit court entered final judgment in favor of the State. CCI appealed and its appeal and the State's appeal were consolidated by this Court, with the State designated as appellee/cross-appellant.

CCI raises the following issues, which we have re-worded:

I. Did the circuit court err in deciding that uncodified § 3 of chapter 603 of the Laws of 2012 was not a special law prohibited by Article III, § 33 of the Maryland Constitution?

II. Did the circuit court err in concluding that the same provision of chapter 603 violated CCI's rights to equal protection of the law?

III. Did the circuit court err in not declaring that chapter 603 constituted a taking of CCI's property without due process?

IV. Did the circuit court err by prohibiting CCI discovery and excluding evidence presented by CCI regarding state-

ments and actions by legislators and/or their personnel who drafted chapter 603?

The State presents the following issue in its cross-appeal: Was the [circuit] court's order compelling the General Assembly of Maryland to disclose documents for *in camera* review entered in violation of the State's sovereign immunity, the speech and debate clause, and the absolute privilege of the General Assembly and its members?

We will affirm the judgment of the circuit court. Turning first to the special law issue, and applying the analysis articulated in *Cities Service v. Governor*, 290 Md. 553, 431 A.2d 663 (1981), and *MDE v. Days Cove*, 200 Md.App. 256, 27 A.3d 565 (2011), we hold that chapter 603 is not a special law. We also conclude that chapter 603 does not violate CCI's equal protection and due process rights. The circuit court's discovery rulings did not prejudice CCI because, to the extent that the information it sought was relevant, it presented unchallenged evidence to the same effect. Our disposition of CCI's issues renders the State's cross-appeal moot.

In order to provide context to the parties' assertions, it is necessary for us to set out the complicated legal and factual background to the current dispute, a task that will involve a fair amount of slow drilling through hard wood.

## BACKGROUND

### The Initial Slot Machine Statute:
### Article 27, Section 264B

The operation of slot machines has been regulated by statute in Maryland since 1963. The original regulations were enacted by ch. 617 of the Acts of 1963 and codified at Md.Code (1957), Art. 27, § 264B. The act provided that: "It shall be unlawful for any person, firm or corporation to locate, possess, keep, maintain or operate any slot machine within this State ..., except as provided in [other parts of the statute]." Art. 27, § 264B(I). The act defined "slot machine" as follows (emphasis added):

Any machine ... that is adapted for use in such a way that, as a result of the insertion or deposit therein, or placing with another person of any piece of money, coin, token or other object, such machine ... is caused to operate or may be operated, and **by reason of any element of chance or of other outcome of such operation unpredictable by him,** the user may receive or become entitled to receive any piece of money, coin, token or other object representative of and convertible into money....

Art. 27, § 264B. The act's purpose was: "to define the term 'slot machines,' [and] to make it unlawful to possess or operate such machines except for a specified period in the four Southern Maryland Counties [Calvert, St. Mary's, Anne Arundel, and Charles Counties] during which these machines were to be gradually decreased year by year and 'providing for the gradual and eventual total abolition ... of all slot machines within this State.' " *Clerk of Circuit Court for Calvert County v. Chesapeake Beach Park, Inc.*, 251 Md. 657, 661, 248 A.2d 479 (1968) (quoting ch. 617 of the Acts of 1963); *see also State v. 149 Slot Machines*, 310 Md. 356, 365, 529 A.2d 817 (1987) ("[T]he General Assembly intended a total abolition of slot machines adapted for gambling."). Although § 264B was amended in 1981 and 1983, the definition of slot machine remained substantively unaltered. *See State v. 158 Gaming Devices*, 304 Md. 404, 407 n. 1, 499 A.2d 940 (1985) (quoting ch. 540 of the Acts of 1983); ch. 280 of the Acts of 1981.

At the time that Article 27 § 264B was enacted, there was no State-wide licensing system for slot machine operations. Instead, some counties had local law provisions permitting them to grant licenses.

### Bingo Enters the Digital Era: *Chesapeake Amusements v. Riddle*

On February 13, 2001, the Court of Appeals issued its opinion in *Chesapeake Amusements v. Riddle*, 363 Md. 16, 766 A.2d 1036 (2001). The issue in Chesapeake Amusements was "whether a dispensing machine with a video screen that displays the contents of the [paper] tickets that it dispenses

and emits a musical tone that signals when a winning ticket is being dispensed is a 'slot machine'" as defined by § 264B. *Chesapeake Amusements,* 363 Md. at 18, 766 A.2d 1036. The parties in that case did not dispute that the machine—called the Lucky Tab II—offered a form of "instant bingo." The parties stipulated that the game of instant bingo involved pre-printed bingo tickets, some of which contained winning combinations of letters and numbers. *Id.* at 20, 766 A.2d 1036. The Court described the Lucky Tab II as:

> an electrically operated machine that dispenses paper pull-tab tickets from a roll of preprinted paper pull-tabs inserted in the machine by [an employee of the operator]. [E]ach ticket dispensed by the Lucky Tab II is part of a particular deal of outwardly identical tickets, in which the total number of tickets, as well as the number of winning tickets, were determined when the deal was constructed and printed.

*Id.* at 21, 766 A.2d 1036. The parties provided an agreed statement of facts explaining how "instant bingo" was played using the Lucky Tab II machine:

> A customer inserts money into the Lucky Tab II and pushes a button located on the front of the machine; a pull-tab ticket is then dispensed into a tray on the front of the machine. When a ticket is purchased from the Lucky Tab II, a bar code reading device in the interior of the machine reads the bar code on the back of the ticket as it is being severed from the roll of tickets and dispensed into the tray. The information from the bar code is used to create a video image of the symbols that appear on the inside of the ticket, and that image is then displayed on the video screen located on the front of the Lucky Tab II. The video image of the symbols on the inside of the ticket is displayed on the screen after a brief delay.... As in a retail store setting, the bar code reader also reads and records accounting information relating to the ticket purchase. The video display of a winning ticket is accompanied by a musical signal. Depending on the amount of money deposited into

the machine by the customer, the dispensing button can be pushed again to dispense another ticket.

*Id.* at 22, 766 A.2d 1036. The parties further agreed that: "it is only on the basis of the symbols that appear on the inside of the paper ticket that a winning ticket is determined," and, thus, that "the symbols that are displayed on the video screen are not used to determine whether the customer is entitled to a prize." *Id.*

In reversing the circuit court's conclusion that the Lucky Tab II was a slot machine under § 264B, the Court emphasized that, in order to constitute a slot machine, the statute required there to "be consideration supplied by the user on the possibility that he or she will receive a prize 'by reason of' the unpredictable operation of the machine." *Chesapeake Amusements,* 363 Md. at 30, 766 A.2d 1036 (quoting § 264B). The Court observed that, in contrast to this requirement, "[t]he Lucky Tab II machine d[id] not pick the paper pull-tab tickets sold in a random fashion," and, instead, "dispensed [tickets] in sequence from the deal placed into it by [the operator's] employee." *Id.* For this reason, among others, the Court reasoned that "it is with the paper pull-tabs with which the game is played," *id.* at 31, 766 A.2d 1036, and not the visual images depicted on the monitor nor the machine's audio accompaniment. *See id.* ("The player enhancement features, the video and audio, respond only to the information contained in the paper pull tabs, and, therefore, have no ability to affect the outcome of the game; the outcome of the game is set once the paper pull-tab is purchased non-randomly."). Because the "element of chance [was] in the pull-tabs themselves, and not in the operation of the machine," the Court concluded that the Lucky Tab II was not a slot machine. *Id.* at 41, 766 A.2d 1036.

*Chesapeake Amusements's* focus on the design and operation of the machine—as opposed to a player's visual and auditory experiences—is a significant element in Maryland's approach to slot machine regulation.

### The Re-Codification of Article 27

By chapter 26 of the Acts of 2002, Maryland's criminal law statutes were recodified as the Criminal Law Article and Art. 27, § 264B was re-codified at Md.Code (2002) § 12–301 of the Criminal Law Article ("CR").[3] Section 12–301 provided, in pertinent part (emphasis added):

In this subtitle:

(1) "slot machine" means a machine, apparatus, or device that:

(i) operates or can be made to operate by inserting, depositing, or placing with another person money, a token, or another object; and

(ii) **through the element of chance or any other outcome unpredictable by the user,** awards the user:

1. money, a token, or other object that represents or that can be converted into money; or

2. The right to receive money, a token, or another object that represents and can be converted into money

\* \* \*

Section 13 of chapter 26 explained that, "except as expressly provided in this Act, this Act shall be construed as a nonsubstantive revision, and may not otherwise be construed to render any substantive change in the criminal law of the State."

### The General Assembly Responds to *Chesapeake Amusements:* Chapter 474 (SB 959) of the Acts of 2008

In 2008, the General Assembly enacted, and the Governor signed into law, Senate Bill 959 (chapter 474 of the Acts of 2008) ("SB 959" or "the 2008 law").[4] The bill's preamble

---

3. Except as specifically noted, all subsequent statutory references in this opinion will be to the Criminal Law Article.

4. Prior to the introduction of SB 959, the General Assembly in 2007 approved amendment Art. XIX to the Maryland Constitution. *See* Acts

indicated that it was passed to accomplish several purposes, including: 1) "altering the definition of 'slot machine' ... to include certain machines, apparatuses, or devices that make a certain award to a user through the reading of a game of chance or the delivery of a game of chance"; 2) "providing that the definition of 'slot machine' does not include certain machines, apparatuses, or devices"; and 3) "authorizing the continued use of certain instant bingo machines under certain circumstances." Chapter 474 amended § 12–301's definition of slot machine as follows (emphasis added):

In this subtitle:

(1) "slot machine" means a machine, apparatus, or device that:

(i) operates or can be made to operate by inserting, depositing, or placing with another person money, a token, or another object; and

(ii) **through the element of chance, the reading of a game of chance, the delivery of a game of chance, or any other outcome unpredictable by the user,** awards the user:

1. money, a token, or other object that represents or that can be converted into money; or

2. The right to receive money, a token, or another object that represents and can be converted into money;

\* \* \*

The bill also expressly excluded certain types of machines from this definition. To this end, § 12–301(3) provided in relevant part (emphasis added):

---

of 2007, 1st Sp. Sess., c. 5, § 1. The amendment provided, in relevant part, that "on or after November 15, 2008, the General Assembly may not authorize any additional forms or expansion of commercial gaming." Art. XIX(d). The exception to this rule is that: "[t]he General Assembly may only authorize additional forms or expansion of commercial gaming if approval is granted through referendum, authorized by an act of the General Assembly, in a general election by a majority of the qualified voters in the State." Art. XIX was ratified on November 4, 2008.

(3) "slot machine" does not include a machine, apparatus, or device that:

\*　　\*　　\*

(iii) dispenses paper pull tab tip jar tickets or paper pull tab instant bingo tickets that must be opened manually by the user provided that the machine apparatus, or device does not:

1. read the tickets electronically;

2. alert the user to a winning or losing ticket; or

3. tabulate a player's winnings and losses;

**(iv) 1. displays facsimiles of bingo cards that users mark and monitor according to numbers called on the premises by an individual where the user is operating the machine; and**

**2. does not permit a user to play more than 54 bingo cards at the same time;**

\*　　\*　　\*

Two other provisions of the 2008 law are pertinent to the present case.

First, CR § 13–101(b) prohibited counties from issuing new bingo licenses to entities "not licensed to conduct commercial bingo on or before June 30, 2008." Thus, the bill effectively closed the class of those operating pursuant to commercial bingo licenses issued on the county level.

Second, the 2008 law contained an uncodified temporary grandfather provision. Section 2 of the act stated (emphasis added): [5]

That, notwithstanding the provisions of Section 1 of this Act, an entity licensed to offer **instant bingo** under a commercial bingo license as of July 1, 2007, or by a qualified organization as defined in § 13–201 of this article on the premises of the qualified organization **may continue to operate a game of instant bingo in the same manner**

---

5. We will refer to this clause as the "instant bingo grandfather clause."

**using electronic machines until January 1, 2009,** provided that:

(1) the machines have been in operation for a 1–year period ending December 31, 2007;

(2) **the entity does not operate more than the number of electronic machines operated as of February 28, 2008;**[6] and

(3) the conduct of the gaming and operation of the machines are consistent with all other provisions of the Criminal Law Article.

The bill went into effect on July 1, 2008.

## CCI Obtains a License from Calvert County

On June 26, 2008, that is, after the enactment and approval of the 2008 law but prior to § 13–101(b)'s cut-off date for new licensees, CCI obtained a NG Beach Bingo License from Calvert County for the Crooked I Bar & Grill, an establishment located in Chesapeake Beach, Calvert County, Maryland. (CCI initially applied for a license in October of 2007 but it was not granted by the county commissioners until June 26th.) The NG Beach Bingo License authorized CCI to conduct bingo operations "throughout the year," seven days a week, without "limitation on seating or player capacity," CR § 13–705(e)(1)(vii),[7] but proscribed the operation "of any [d]evice specifically prohibited by law." CCI began operating approximately 105 electronic bingo machines at the Crooked I in May of 2009.

The trial court found, and the parties do not dispute on appeal, that CCI's machines did not offer a game of "instant bingo" as described in *Chesapeake Amusements*[8] Instead,

---

6. SB 959 was introduced on February 27, 2008.

7. CR § 13–701 *et seq.* sets forth gambling provisions applicable only in Calvert County.

8. There is no statutory or judicial definition of the game of "instant bingo" in this State. The parties, as well as the circuit court, adopted the description of "instant bingo" set forth in *Chesapeake Amusements*.

CCI's machines offered a form of "bonanza bingo," which Richard LaBrocca—the State's expert witness—described as follows:

> Bonanza bingo is a style of bingo where balls are predrawn, a variable number of balls, generally not all of them, but it could be. And then a player makes a purchase of a bingo card, which is then applied to those balls. Dobbing—the ball is drawn, in an attempt to match a predesignated pattern for winning the prize. The balls remain fixed. Ball players purchase many bingo cards and attempt to achieve the game-ending pattern, regardless of what the pattern may be.

In appearance and from the perspective of a user, CCI's machines were nearly indistinguishable from video slot machines.[9] The machines were housed in free-standing, six-foot tall terminals that featured a headboard with a vertical video screen that displayed various phrases—e.g., Wicked Mad Hot, Some Like it Hot, and similar expressions—as well as the amount of the current jackpot. Below the headboard sat a second, diagonally-positioned video screen that prominently featured a five column scrolling bar or electronic "reel" that displayed various objects such as cherries, bells, poker chips, crowns, hearts, and large letters and numbers, among other symbols, which rotated in a fashion that corresponded to the success of the user in the game. A small display above the scrolling bar displayed a bingo card, which the machine automatically filled in for the user as the user pressed a button on the terminal. If the user was lucky enough to draw a winning bingo card upon the user's press of the button, the machine's lower video screen flashed, displayed a reel and bingo card with a winning combination, and the screen informed the user of the number of credits he or she had won. If the user did not draw a winning combination, the machine's lights did not

---

*See* 363 Md. at 22, 766 A.2d 1036. For purposes of our analysis, we do the same.

9. Several witnesses testified that, from their perspective as a user, there was *no difference* between CCI's machines and slot machines.

flash, and the bingo card and reel revealed that the user had lost the game. A user could continue to play the game so long as he or she had sufficient credits—i.e., had entered the required payment into the system, or had accumulated enough winnings to continue playing—until the user requested a cash out ticket of whatever credits remained. The machine permitted the user, through the hitting of buttons, to select different levels of play and to bet varying amounts as the game continued.

CCI's machines were pre-programmed to deliver a certain payout percentage—i.e., the percentage likelihood of winning—and could be reprogrammed by CCI to deliver varying payout percentages. The bingo "balls" that corresponded to the bonanza bingo game were not drawn nor called contemporaneously.[10] Instead, according to Christopher Russell, one of CCI's owners, the numbers were precalled by an individual and then entered into and stored on a computer server, which was then accessed by the bingo machines during play. Mr. Russell testified that the numbers were pre-called by an individual at the Crooked I in an attempt to bring the machines within the ambit of § 12–301(3)(iv).[11]

Before it began operations, CCI's representatives met with the State's Attorney for Calvert County on several occasions regarding whether its machines complied with Maryland law. On December 11, 2008, the State's Attorney wrote CCI, stating that she believed that the proposed machines offered a form of "bingo" but that there was a degree of uncertainty about the matter, and that, as a result, she had requested advice from the Attorney General's Office.

---

**10.** Whether actual bingo balls were used is unclear, and, in any event, this appears to have played little role in how the machines operated.

**11.** Section 12–301(3)(iv) provided that the definition of "slot machine" did not include a device that "1. displays facsimiles of bingo cards that users mark and monitor according to numbers called on the premises by an individual where the user is operating the machine; and 2. does not permit a user to play more than 54 bingo cards at the same time[.]"

On January 15, 2009, then-Assistant Attorney General Robert N. McDonald, Chief Counsel of the Opinions and Advice division of the Attorney General's Office,[12] replied to the State's Attorney's request. Mr. McDonald advised that most, if not all, of the types of electronic machines proposed for use by CCI constituted either: 1) lottery devices prohibited by § 12–205,[13] or 2) slot machines prohibited by § 12–302.[14] He advised that CCI's proposed machines did not fall within § 12–301(3)(iv)'s slot machine exclusion because the exemption "requires a live call" and CCI's proposed games "would involve numbers being selected by a machine." He further stated that:

> A video bingo machine may comply with the 2008 amendments of the criminal gambling laws if it displays facsimiles of bingo cards and the game is based on numbers called on the premises by a live caller, among other things. Thus, the legality of a particular machine will depend on how the machine functions, as well as how the game is conducted.

(citing § 12–301(3)(iv)). On April 30, 2009, Mr. McDonald issued a second advice letter responding to and rejecting several additional claims made by CCI. The analysis in Mr. McDonald's second letter is consistent with that of the first.

In May of 2009, CCI began operating approximately 105 electronic bingo machines at the Crooked I Bar & Grill.

---

**12.** Mr. McDonald is now an Associate Judge of the Court of Appeals.

**13.** Section 12–205 provides, in pertinent part, that:
 (b) *Prohibited.*—A person may not:
 (1) bring a lottery device into the State; or
 (2) possess a book, list, slip, or record of:
 (i) the numbers drawn in a lottery in this State or another state or country;
 (ii) a lottery device; or
 (iii) money received or to be received from the sale of a lottery device.

**14.** Section 12–302 provides, in pertinent part, that:
 (a) *Prohibited.*—Except as allowed under §§ 12–304 through 12–306 of this subtitle, a person may not locate, possess, keep, or operate a slot machine in the State as an owner, lessor, lessee, licensor, licensee, or in any other capacity.

Almost immediately thereafter, concerns arose about the legality of CCI's machines. We will describe these later.

### The General Assembly Extends the Temporary Grandfather Provision: Chapter 661 of the Acts of 2009

Meanwhile, the General Assembly passed House Bill 193, chapter 661 of the Acts of 2009, which amended the uncodified temporary grandfather provision of chapter 474 in two pertinent ways. First, the bill extended chapter 474's temporary grandfather provision for electronic machines offering instant bingo to July 1, 2012. Second, it amended the class of machines recognized by the instant bingo grandfather clause. To this end, chapter 661 provided (amendments emphasized):

That, notwithstanding the provisions of Section 1 of this Act, an entity licensed to offer instant bingo under a commercial bingo license as of July 1, 2007, or by a qualified organization as defined in § 13–201 of this article on the premises of the qualified organization may continue to operate a game of instant bingo in the same manner using electronic machines until July 1, 2012, provided that:

(a) (1) the machines have been in operation for a 1–year period ending December 31, 2007; **or**

(2) **the machines were in operation under a commercial bingo license as of December 31, 2007;**

(b) the entity does not operate more than the number of electronic machines operated as of February 28, 2008; and

(c) the conduct of the gaming and operation of the machines are consistent with all other provisions of the Criminal Law Article.

Additionally, chapter 661 § 4 stated:

[N]otwithstanding any provision of this Act, it is the intent of the General Assembly that the proliferation of gaming in the State be reduced by limiting the use of gaming machines that are similar in appearance and operation to video lottery terminals and that, in authorizing the temporary

continuation of gaming activity with such machines by commercial and charitable entities that have operated such machines over a long period of time, this Act be construed not as approval of an expansion of such gaming, but as enacting a mechanism to provide additional funding required to address the State's important fiscal needs on a temporary basis while the State video lottery terminal program is being implemented.

### Concerns About the Legality of Electronic Bingo Operations in Calvert and Anne Arundel Counties

In November of 2009, Thomas V. Mike Miller, Jr., President of the Maryland Senate, requested advice from the Attorney General's Office as to the legality of certain electronic bingo machines being operated in establishments located in Calvert and Anne Arundel Counties.

On November 16, 2009, Attorney General Douglas F. Gansler replied to Senate President Miller. In his letter, Mr. Gansler stated that:

> this Office [has previously] concluded that an electronic form of the game was still bingo where the game is played against other players rather than against the game itself; numbered balls are drawn at random by a person from a mechanical device, rather than generated by the machine; numbers are called and matching numbers on cards are covered; and the game is won when a player covers numbers in a designated pattern and announces a 'bingo.'

(Citations omitted). Mr. Gansler also observed that:

> In a letter ... dated June 25, 2008, Assistant Attorney General Kathryn M. Rowe concluded that a machine that generated the numbers itself, rather than using numbers called by a live person, would not fit within [§ 12–301(3)(iv) ]. In a subsequent letter ... dated August 18, 2008, Ms. Rowe advised that a game that used numbers called on the premises by an individual, that displayed cards that could be marked on the machine, or printed and

marked manually, and that did not permit play of more than 24 cards at a time did fall within § 12–301(3)(iv).

Against this backdrop, Attorney General Gansler responded to several questions posed by Mr. Miller, explaining, in relevant part, that:

The definition of bingo ... contemplates a "live call"—*i.e.*, each number is called as it is drawn and players have an opportunity to mark the number and monitor the progress of their card or cards before the next number is drawn. In our view, a live call occurs when the numbers are called simultaneously—*i.e.*, live—as opposed to being provided in some recorded format. This understanding is also reflected in the exception to the definition of "slot machine" in CR § 12–301(3)(iv) for machines that assist bingo players to mark and monitor facsimiles of bingo cards as numbers are called on the premises where the game is being played. To the extent that prior advice of this Office may have suggested that numbers could be called in their entirety prior to the conduct of the game, that conclusion would be inconsistent with the common understanding of how bingo is played.

(internal citations omitted). And that (emphasis added):

It is our view that the requirement that the player use the machine to "mark and monitor" the card was expressly intended to prohibit the use of machines that operate like slot machines except for the minor detail of showing a picture of a bingo card somewhere on the display. **A machine that electronically applies a full draw of numbers to a card simultaneously, without requiring any participation of the player to "mark and monitor" the card, would violate both the letter and the spirit of this requirement.**[15]

---

**15.** The record includes a DVD showing one of CCI's machines in operation. Setting aside, for a moment, how CCI's machines operate from a technical standpoint, it appears from the video that they "operate like slot machines except for the minor detail of showing a picture of a bingo card somewhere on the display" and that they "electronically appl[y] a full draw of numbers to a card simultaneously, without

## CCI Enters the Debate

On December 1, 2009, in a letter addressed to the State's Attorney for Calvert County, CCI owner Ryan Hill responded, in part, to Attorney General Gansler's November 16th letter. Mr. Hill expressed his belief that CCI was "currently operating games that we believe [the State's Attorney's Office] found to be compliant and [that are] also acceptable by the Attorney General's [O]ffice." Mr. Hill also stated that he disagreed with the Attorney General's view that the slot machine exemption found in § 12–301(3)(iv) applied only to those machines operating pursuant to a "live call" of bingo numbers.

In support of his contention (and ignoring the Attorney General's statement clarifying the Office's position on the matter), Mr. Hill cited to one of the advice letters written by Assistant Attorney General Rowe in 2008, which he interpreted as suggesting that certain types of electronic bingo machines fit within the ambit of § 12–301(3)(iv) even though they did not operate according to a "live call." [16] Mr. Hill also cited

---

requiring any participation of the player to 'mark and monitor' the card...."

**16.** In his letter, after asserting that CCI's machines offer a form of "Rapid Bingo," Mr. Hill stated: "As the Attorney General notes [in] his recent letter to Senator Miller, Rapid Bingo was reviewed in 2008 by Assistant Attorney General Kathleen Rowe, who concluded that the game falls within the exception to the definition of 'slot machine' in CR § 12–301(3)(iv), and is therefore legal in Maryland....": We place less significance on Ms. Rowe's prior letter than does CCI.

The record suggests that "Rapid Bingo" is a generic term used to refer to various types of bingo games which, by pre-drawing numbers, permit users to play bingo at a faster-than-normal rate. In *Chesapeake Amusements,* the Court drew the line between what was then a legal electronic instant bingo machine and an illegal slot machine based upon "the possibility that [the player] will receive a prize **by reason of the unpredictable operation of the machine.**" *363 Md.* at 30, *766 A.2d* 1036 (emphasis added, citation and quotation marks omitted). That Ms. Rowe concluded that a Rapid Bingo game offered by another operator complied with the law is irrelevant to this case unless CCI demonstrated that its games operated in the same way and complied with the other requirements of the 2008 law, specifically, § 12–301(3)(iv)'s requirement that the electronic bingo machine cannot "mark and monitor" bingo cards for players.

to the legislative history of the 2008 law; specifically, he pointed out that an early version of § 12–301(3)(iv) provided (emphasis added):

(3) "slot machine" does not include a machine, apparatus, or device that:

\* \* \*

(iv) 1. displays facsimiles of bingo cards that users mark and monitor **as numbers are called by an individual located on the premises** where the user is operating the machine; and

2. does not permit a user to play more than 54 bingo cards at the same time;

and that the bill was subsequently amended to the form eventually codified at § 12–301(3)(iv) (emphasis added):

(3) "slot machine" does not include a machine, apparatus, or device that:

\* \* \*

(iv) 1. displays facsimiles of bingo cards that users mark and monitor **according to numbers called on the premises** by an individual where the user is operating the machine; and

2. does not permit a user to play more than 54 bingo cards at the same time;

This legislative history, according to Mr. Hill, supported CCI's theory that "[n]o temporal proximity between the calling and the marking can be inferred from [the language of § 12–301(3)(iv) ]"—in other words, that § 12–301(3)(iv) did not require a contemporaneous "live call" of bingo numbers.

Mr. Hill did not, however, state or even suggest that CCI's electronic bingo machines satisfied the "mark and monitor" requirement of § 12–301(3)(iv), nor did he respond to the

---

In any event, the Attorney General is free to alter his or her position on such matters. *See, e.g., Sheriff of Baltimore City v. Abshire,* 44 Md.App. 256, 262 n. 6, 408 A.2d 398 (1979) ("We are not to be understood as being critical of the Attorney General's altering of his position. There is clear precedent for such action.").

Attorney General's determination that the § 12–301(3)(iv) exclusion did not apply to machines, such as those being operated by CCI, which "electronically appl[y] a full draw of numbers to a card simultaneously, without requiring any participation of the player to 'mark and monitor' the card . . . ." [17]

On March 10, 2011, an agent from the Field Enforcement Bureau of the Comptroller's Office visited CCI's premises.[18] After inspecting the machines, the agent reported that it was his opinion that "the bingo operation at the Crooked I bar is lawful." However, for reasons unexplained in his report, the agent did not consider whether CCI's machines constituted slot machines under § 12–301, nor did he reference the statute. Instead, the agent based his conclusion on a California statute, specifically, Cal. Business Licenses and Regulations Code § 5.94.010 (defining bingo as "a game of chance in which prizes are awarded on the basis of designated numbers or symbols on a card which conform to numbers or symbols selected at random.").

On May 6, 2011, the State's Attorney wrote a letter to Senate President Miller in which she highlighted the conclusions of the Comptroller's agent, identified purported inconsistencies between advice given by the Attorney General's Office as to the legality of certain types of electronic bingo machines, and explained her view that (emphasis in original):

> I am, of course, aware of the Attorney General Opinion (11/16/09) wherein Attorney General Douglas Gansler opined that certain Rapid Bingo Machines and Games would not, in his opinion, be considered legal if the numbers were called live prior to the start of play. He specifically stated that a prior, inapposite opinion, given by his office in 2008

---

**17.** When asked at oral argument how CCI's machines permit a user to "mark and monitor" the bingo card, counsel for CCI stated, in essence, that the machines automatically fill in the bingo card upon the user's press of a button, and that several other establishments in Calvert and/or Anne Arundel Counties operate machines that act similarly.

**18.** The record indicates that the inspection was requested by Senate President Miller.

would be "inconsistent with the common understanding of how bingo is played." While I agree that a live call in its entirety prior to the game beginning may be considered inconsistent with the "common understanding of how the game is played" and, thus, may violate the "spirit" of the law, I am still in agreement with the earlier decision of the Attorney General's Office, that this practice does not violate the **letter** of the law. The obvious fact that even within the Attorney General's Office there is division about this issue shows quite clearly that the law relating to Bingo and instant Bingo is confusing, at best, and vague at worst. Without a clear definition of how the State defines "Bingo" I cannot prosecute an individual or business for violating the "spirit" of the law.

As the issue of Instant Bingo continually raises questions—not only in this county, but across the state—and the gaming industry becomes increasingly more creative in the creation of electronic bingo games and systems, I would hope that the General Assembly would step forward and draft and pass an addition to the current law that clearly defines what will be considered a legal game of Instant Bingo/Bingo in the State of Maryland . . .

On October 17, 2011, in response to a subsequent inquiry from Senate President Miller as to the legality of the electronic bingo machines being operated at the Crooked I, Assistant Attorney General Rowe advised that CCI's electronic bingo machines constituted slot machines under § 12–301 and that they did not fall within any of the enumerated exemptions. In support of her opinion, Ms. Rowe observed that, "[w]hile the machine displays bingo cards, it is my understanding that the players do not mark and monitor their cards as required by CR § 12–301(3)(iv), as the machine covers the numbers whether the player is looking or not, without any action by the player." Quoting Attorney General Gansler's Nov. 16, 2011 letter, Ms. Rowe also explained that (emphasis in original):

In addition, while the numbers are apparently called on the premises by an individual, they are not called "where the user is operating the machine," but prior to the time that

any games are played or the player is present. This office has read CR § 12–301(3)(iv) to require ... that the numbers be "called simultaneously—*i.e.,* live—as opposed to being provided in some recorded format." The draw cannot otherwise be described as numbers that "are called on the premises where the game is **being** played."

All this is as preamble. We now turn to the legislation that sparked the case before us.

### The General Assembly's 2012 Term

#### 1. House Bill 927

During the 2012 legislative session, the House of Delegates considered House Bill 927. The bill, apparently introduced at CCI's request and certainly supported by it, proposed to make permanent the temporary grandfather provision for machines offering instant bingo and to expand it to include other types of electronic bingo machines—such as the ones operated by CCI—that did not offer the game of instant bingo. Specifically, the bill proposed to codify the following grandfather provision at CR § 12–308 (emphasis added):

Notwithstanding any other provision of this subtitle, an entity in **Calvert County** licensed to offer **electronic or instant bingo** under a commercial bingo license on **December 31, 2008,** or a qualified organization as defined in § 13–201 of this article on the premises of the qualified organization, may continue to operate a game of electronic or instant bingo in the same manner using electronic machines, provided that:

(1) (i) the machines were in operation for a 1–year period ending **December 31, 2008; or**

(ii) the machines were in operation under a commercial bingo license on **December 31, 2009;**

(2) the entity does not operate more than the number of electronic machines in operation on **December 31, 2008; and**

(3) the conduct of the gaming and operation of the machines are consistent with all other provisions of this article.

HB 927 was passed by the House of Delegates but it received an unfavorable report by the Senate Budget and Taxation Committee—of the committee's thirteen members, one was absent and the other twelve voted against it—and was never acted upon by the Senate.

## 2. Chapter 603 of the Acts of 2012

In the same session, the General Assembly passed Senate Bill 864 (chapter 603 of the Acts of 2012), which was signed into law by Governor O'Malley shortly thereafter. In addition to a number of changes not directly relevant to the issues before us, chapter 603 amended § 12–301(3)(iv)—which provided that the definition of slot machine excluded electronic bingo card minders—to address the perceived ambiguities in the statute. This amendment was in response, at least in part, to the previously-described debate about the legality of CCI's machines and the Calvert County State's Attorney's misgivings about the statute.

Victoria Gruber, Senate President Miller's Chief of Staff, testified in favor of SB 864 before the Senate Budget and Taxation Committee. She stated, in pertinent part (emphasis added):

[I]f you take a look in the packet . . . you can see there was a location in the President's [Senate President Miller's] district that was arguing the devices that they were using were bingo "card minders." [i.e., that they fell within the § 12–301(3)(iv) exclusion to the definition of slot machine.] And if you look at the pictures of the devices from the website of the location, they look like slot machines and clearly weren't bingo card minders as was contemplated by the committee in 2008 [in Senate Bill 959]. The President asked the Comptroller to go in and look at the machines because they clearly weren't bingo card minders as have been envisioned by the committee and what's in the law. The Comptroller went in—or he sent in a representative . . .

[who] looked at the wrong sections of the law ... and identified these machines as bingo.... The local State's Attorney for Calvert County said she didn't want to get involved because she thought that the law wasn't clear and **so [this] bill now includes a provision making it very clear that a bingo card minder is a hand held device that's used to mark and monitor bingo numbers according to a live game of bingo that's happening at the same time....**

In a similar vein, Senator James DeGrange, Sr., SB 864's sponsor, in written testimony, explained to the House Ways & Means Committee that SB 864 "clarifies the definition of a bingo card minder as an exception to the definition of illegal gaming device consistent with the intent of the 2008 law." [19]

As enacted, chapter 603 amended the definition of "slot machine" in § 12–301 to read, in pertinent part, as follows (amendments emphasized):

(3) "slot machine" does not include a machine, apparatus, or device that:

\*　　\*　　\*

(iv) 1. **is a handheld device that** displays **only** facsimiles of bingo cards that **an individual uses to** mark and monitor **contemporaneously to a live call of bingo numbers** called on the premises by an individual where the user is operating the machine; **and**

---

19. CCI owner Ryan Hill also testified before the committee. In his testimony, Mr. Hill stated that CCI was, "the entity that M[s]. Gruber spoke of that operates the machines ... [where] winners and losers are based on achieving certain bingo patterns with the electronic machines as opposed to the other three operators in Chesapeake Beach and three operators in Anne Arundel County that operate machines—electronic machines that award prizes based on a predetermined number of winners and losers...."

Mr. Hill requested—in an approach similar to the proposals contained in House Bill 927—that the General Assembly expand the instant bingo grandfather clause to include the type of electronic bingo machines being operated by CCI, and to change the cut-off dates contained in previous versions of the clause so that CCI's machines would qualify. Mr. Hill's suggested amendments were not formally introduced.

2. does not permit a user to play more than 54 bingo cards at the same time;

3. **does not randomly generate any numbers; and**

4. **is not part of an integrated system;**

\* \* \*

Chapter 603 added § 12–208, which stated (amendments emphasized):

That, notwithstanding the provisions of **this subtitle,** an entity licensed to offer instant bingo under a commercial bingo license as of July 1, 2007, or by a qualified organization as defined in § 13–201 of this article on the premises of the qualified organization may continue to operate a game of instant bingo in the same manner using electronic machines, provided that:

(1) (i) the machines **were** in operation for a 1–year period ending December 31, 2007; or

(ii) the machines were in operation under a commercial bingo license as of December 31, 2007;

(2) the entity does not operate more than the number of electronic machines **in operation on** February 28, 2008; and

(3) the conduct of the gaming and operation of the machines are consistent with all other provisions of **this article.**

The language in § 12–308 tracked the language of the previous uncodified temporary grandfather provisions for instant bingo operators established in 2008 by Chapter 474 of the Laws of 2008 and extended for an additional year by Chapter 661 of the Laws of 2009, thus changing what had been a temporary reprieve into a permanent exemption. Section 12–208 did not benefit CCI for two reasons: first, it was not licensed or in operation as of December 31, 2007; second, its machines did not offer games of instant bingo.

Chapter 603 contains several uncodified sections, two of which are pertinent to the present case. Section 3 states (emphasis added): [20]

> That, a licensee or organization that is authorized under State law to own or operate electronic bingo machines for use after July 1, 2012, may repair and replace the authorized **electronic bingo machines** provided that the machines operate in the same manner as those in operation by the same organization as of February 28, 2008, and that the organization does not operate more than the number of **electronic bingo machines** in operation as of February 28, 2008.

Section 4 provides (emphasis added): [21]

> That a qualified organization as defined in § 13–201 of the Criminal Law Article that offered **instant bingo** for a 1–year period as of December 31, 2007, and then was required by local regulation to obtain a commercial bingo license may operate up to 10 **electronic instant bingo machines** as long as the qualified organization complies with the requirements of this Act and pays any applicable license taxes.

The bill went into effect on July 1, 2012.

At this stage in the proceeding, there is no dispute that CCI's electronic bingo machines are slot machines under § 12–301, as amended by chapter 603, and that they do not fall within any of the enumerated exemptions. There is, additionally, no dispute that CCI's machines do not offer "instant bingo" and, thus, that they are not of a type grandfathered by § 12–308.

---

**20.** Unless otherwise specified, when we refer to "uncodified § 3" or " § 3", we are referring to chapter 603, § 3.

**21.** Unless otherwise specified, when we refer to "uncodified § 4" or " § 4", we are referring to chapter 603, § 4.

The record suggests that the Chesapeake Beach American Legion Post sought what became uncodified § 4 of the 2012 law because, prior to the enactment of the 2008 law, the Post had been operating ten machines under the belief that it did not need a license, and, as a result, could not satisfy the requirements of the instant bingo grandfather provisions.

## The Circuit Court Proceedings

On June 21, 2012, CCI filed a nine-count complaint in the Circuit Court for Anne Arundel County, seeking an injunction and a declaration that uncodified § 3 of chapter 603 was an unconstitutional special law, that it violated equal protection principles, that it was a taking of property without due process, that it violated CCI's procedural due process rights, that it was unconstitutionally vague and overbroad, and that it violated Maryland's prohibition against *ex post facto* laws and monopolies granted by the State. These claims rested primarily on CCI's assertion that the effect of chapter 603 was that CCI was prohibited from continuing its electronic bingo operations, while the six other establishments operating electronic bingo machines in Calvert and Anne Arundel Counties were permitted to continue their operations.

On June 29, 2012, the circuit court entered a temporary restraining order, and the matter was set in for a hearing on CCI's request for a preliminary injunction.[22] Prior to the hearing, CCI served discovery and subpoena requests on Senate President Miller, Ms. Gruber, and the General Assembly, seeking to obtain certain documents related to the drafting and passage of SB 864. Senate President Miller, Ms. Gruber, and the General Assembly moved to quash the subpoenas, and the circuit court granted the motion. The State did, however, agree to produce certain documents related to the legislative history of chapter 603.[23] In response, CCI filed a motion to compel discovery, and, on July 16, 2011, the circuit court issued the following order:

> The Maryland General Assembly hereby is directed to promptly provide to the Court for in camera review any recorded communications between the bill requestor(s) and the bill drafter(s) related to drafting of the bill eventually

---

**22.** The State filed a notice of appeal of the court's granting the temporary restraining order.

**23.** At the time of the circuit court proceedings, the official legislative bill file for chapter 603 had not yet been compiled by the Department of Legislative Services.

introduced as Senate Bill 864 (2012 session) which occurred on or after the time of the initial Bill Request form so that [t]he Court may screen these communications to direct disclosure of any amended bill request(s) and supplemental instructions relating to the bill drafting and to direct nondisclosure of any other recorded communications as privileged which do not constitute an amended bill drafting request or supplemental related instructions....

The circuit court denied CCI's remaining discovery requests. That same day, the State noted an appeal from this order.

On July 16 and 18, 2012, the circuit court held an evidentiary hearing on CCI's request for a preliminary injunction. We will discuss the pertinent evidence in our analysis. On the day after the hearing concluded, the court issued a memorandum opinion and order denying CCI's request for a preliminary injunction. The court concluded that chapter 603 was not a special law targeted at the Crooked I Bar & Grill, and denied CCI's remaining claims.

First, the court observed that "instant bingo" was not defined in CR § 12–301 *et seq.* The court determined that, even though the definition of "instant bingo" used by the Court of Appeals in *Chesapeake Amusements* was established by stipulation, it remained "cogent." Second, applying this definition of "instant bingo," the court found that, "the crucial element of chance as embodied in CCI's machines now is derived, at least partly, from the programming and operation of the machines, not just their pre-recorded bingo calls." On this point, the court explained that (emphasis added):

> **The expert testimony ... indicated that the pre-called bingo numbers form only part of the programming by which the machine provides a win or loss for a customer.** By inference, another formula could be substituted for the bingo call such as the pre-recorded results of a coin toss, dice rolls, [etc.] with the machines adjusted accordingly to obtain similar statistical results. Both experts and actual customers indicated that, as currently operated, CCI customers are unaware of any role played by a bingo call or by

a bingo card facsimile in their use of the machines which, to the untutored eye, appear no different than any other slot machine. Per *Chesapeake Beach, supra,* the customers' perception is irrelevant to the machines' legal status. **But, the actual intervention of machine-based programming to change the prerecorded odds is relevant and, in part, gives rise to the current illegal status of CCI's machines.**

Third, the circuit court concluded that the testimony of Christopher Russell, one of CCI's principals, that CCI's machines offered bonanza bingo, constituted "a judicial admission ... that [CCI's] devices are not instant bingo." Fourth, the court observed that CCI did not dispute that its machines were part of an "integrated system" and that "the machines played by all customers simultaneously make use of an electronically-transmitted, pre-recorded call of bingo numbers." In light of these observations, the court concluded that CCI's machines did not offer "instant bingo" and, therefore, that they did not fall within the scope of the § 12–308 instant bingo grandfather clause.[24] Likewise, the court determined that CCI's machines did not fall within the ambit of any of the exclusions found in § 12–301(3).[25] Finally, the circuit court

---

**24.** Section 12–308 provides:
Notwithstanding any other provisions of this subtitle, an entity licensed to offer instant bingo under a commercial bingo license on July 1, 2007, or by a qualified organization as defined in § 13–201 of this article on the premises of the qualified organization may continue to operate a game of instant bingo in the same manner using electronic machines, provided that:
(1) (i) the machines were in operation for a 1–year period ending December 31, 2007; or
(ii) the machines were in operation under a commercial bingo license on December 31, 2007;
(2) the entity does not operate more than the number of electronic machines in operation on February 28, 2008; and
(3) the conduct of the gaming and operation of the machines are consistent with all other provisions of this article.

**25.** Section 12–301(3) provides in pertinent part:
(3) "slot machine" does not include a machine, apparatus, or device that:
 * * *
(iv) 1. is a handheld device that displays only facsimiles of bingo cards that an individual uses to mark and monitor contemporane-

concluded that the legislative history of chapter 603 demonstrated that, while the General Assembly intended to make it clear that CCI's machines did not fall within the § 12–301(3)(iv) exclusion, the legislation was also directed at other gambling operations, including internet sweepstakes game rooms, located in Baltimore City and Baltimore County.[26]

The circuit court also rejected CCI's equal protection and takings claims and adopted by reference "the arguments presented in the State's Opposition memorandum, docketed herein on June 12, 2012...." We will discuss the equal protection and takings contentions in Parts II and III.

Thereafter, the parties stipulated that the court's ruling on CCI's request for a preliminary injunction should be consolidated with the trial on the merits. The court entered judgment in accordance with the stipulation. This appeal followed. Subsequently, CCI's appeal and the State's prior appeal were consolidated so that both are before us.

## ANALYSIS

CCI does not challenge any of the findings of fact made by the circuit court. We review the circuit court's application of law to the undisputed facts in this case *de novo*. *See, e.g., Reichs Ford Road Joint Venture v. State Roads Comm'n*, 388 Md. 500, 509, 880 A.2d 307 (2005). In interpreting a statute, our goal is to discern the legislature's intent. *Breslin v. Powell*, 421 Md. 266, 286, 26 A.3d 878 (2011). We look to the plain language of the statute, giving it its natural

---

ously to a live call of bingo numbers called on the premises by an individual where the user is operating the machine; and

2. does not permit a user to play more than 54 bingo cards at the same time;
3. does not randomly generate any numbers; and
4. is not part of an integrated system....

26. Internet sweepstakes game rooms feature machines set up to "mimic, at least in appearance, slot machines and are offered for use to those who purchase internet time." Fiscal and Policy Note for SB 864. HB 664 amended the definition of slot machine to include such devices. *See* Section 12–301(2)(iii).

and ordinary meaning, *State Dep't of Assessments & Taxation v. Maryland–Nat'l Capital Park & Planning Comm'n,* 348 Md. 2, 13, 702 A.2d 690 (1997), and read the statute in the context of its statutory scheme. *Breslin,* 421 Md. at 287, 26 A.3d 878.

## I. A Special Law?

Article III, § 33 of the Maryland Constitution provides, in pertinent part, that "the General Assembly shall pass no special Law, for any case, for which provision has been made, by an existing General Law." While the prohibition against special legislation may serve other interests,[27] one of the important historical purposes behind § 33's prohibition against "special laws" has been " 'to prevent one who has sufficient influence to secure legislation from getting an undue advantage over others....' " *Cities Service v. Governor,* 290 Md. 553, 568–69, 431 A.2d 663 (1981) (quoting *M. and C.C. of Baltimore v. U. Rys. & E. Co.,* 126 Md. 39, 52, 94 A. 378 (1910)). Two cases interpreting and applying Maryland's prohibition against special laws are particularly relevant to our analysis. The first is *Cities Service,* in which the Court of Appeals articulated the appropriate standard of analysis to be used in deciding whether a statute is a special law. The second is this Court's decision in *MDE v. Days Cove,* 200 Md.App. 256, 27 A.3d 565 (2011), which applied, explained, and elaborated upon the *Cities Service* analysis. We begin with *Cities Service.*

The issue before the Court in *Cities Service* was whether a provision in a statute regulating the ownership of retail service stations, the so-called "Divestiture Law", was an unconstitutional special law.[28] At the time, the Divestiture Law general-

---

**27.** *See* Dan Friedman *Applying Federal Constitutional Theory To the Interpretation of State Constitutions: The Ban on Special Laws in Maryland,* 71 Md. L.Rev. 411, 443 (2012) (concluding that the sparse legislative history of Section 33 indicates that it was intended to foster the separation of powers and the independence of the judiciary).

**28.** The current version of the Divestiture Law is found at Md.Code (1992, 2010 Repl.Vol.) § 10–311 of the Business Regulation Article.

ly prohibited petroleum producers and their subsidiaries from operating retail gasoline service stations with their own personnel. 290 Md. at 555, 431 A.2d 663. The law contained exceptions, one of which was referred to as the "mass merchandiser exemption." This exemption applied only to "a retail station in operation on January 1, 1979, that was operated by a subsidiary of a petroleum producer or refiner as of January 1, 1979, on a year to year basis as long as the subsidiary's gross revenues from petroleum products sold in Maryland are less than two percent of the subsidiary's gross revenues from all retail operations in Maryland." *Id.* at 557, 431 A.2d 663. The only business that met these criteria was Montgomery Ward & Co., then a subsidiary of the Mobil Corporation.

The Court began its analysis by noting that, although the concept of a special law had been articulated in various ways in earlier cases, " '[a] special law is one that relates to particular persons or things of a class, as distinguished from a general law which applies to all persons or things of a class.' " *Id.* at 567, 431 A.2d 663 (quoting *Prince George's County v. B. & O.R. Co.*, 113 Md. 179, 183, 77 A. 433 (1910)) (brackets added by *Cities Service* ); *see also Jones v. Anne Arundel County*, 432 Md. 386, 403, 69 A.3d 426 (2013) ("Special laws 'relate[ ] to particular persons or things of a class, as distinguished from a general law which applies to all persons or things of a class,' and are enacted 'for the relief of particular named parties, or providing for individual cases.' " (internal citations omitted; quoting *Prince George's County v. B & O*, 113 Md. at 183, 77 A. 433, and *Montague v. State*, 54 Md. 481, 490 (1880))). In determining whether a law relates to particular entities within a legislatively-established class, instead of to the class as a whole, the Court of Appeals observed that its prior decisions had "pointed to various considerations and factors, although certainly no one is conclusive in all cases." *Cities Service*, 290 Md. at 569, 431 A.2d 663. These included:

(a) the underlying purpose of the legislation in question to determine whether it was actually intended to benefit or

burden a particular member or members of a class instead of an entire class,

(b) whether particular individuals or entities are identified in the statute either explicitly or by clear implication, as determined by a consideration of the substance and "practical effect" of an enactment as well as its form,

(c) whether a particular individual or business sought and received special advantages from the Legislature, or if other similar individuals or businesses were discriminated against by the legislation,

(d) the public need and public interest underlying the enactment, and the inadequacy of the general law to serve the public need or public interest; and

(e) whether the legislatively drawn distinctions are arbitrary and without any reasonable basis.

*Id.* at 569–70, 431 A.2d 663; *see also Green v. N.B.S., Inc.*, 409 Md. 528, 544–45, 976 A.2d 279 (2009) (citing *Cities Service*); *Days Cove*, 200 Md.App. at 265–66, 27 A.3d 565 (quoting and applying the *Cities Service* factors).

The *Cities Service* Court determined that the exemption before it was an unconstitutional special law because (emphasis added):

The record in this case shows that the exemption was sought by Montgomery Ward, that the legislature was advised that one business was the sole beneficiary, that Montgomery Ward is the only subsidiary of a producer or refiner which can qualify, and that no other existing general retail mass merchandiser could qualify in the future if it became a subsidiary.

\* \* \*

[T]he effect of the January 1, 1979, qualifying dates is virtually the same as if the statute had named Montgomery Ward. The qualifying dates are . . . the "equivalent manner" of identifying Montgomery Ward. . . . It is undisputed that no existing retail mass merchandiser in Maryland—no competitor of Montgomery Ward—could in the future come

within the exemption because of the January 1, 1979 "grandfather clauses."

290 Md. at 570–72, 431 A.2d 663.

After concluding that the mass merchandiser exception was a special law, the Court decided that the appropriate remedy was not to declare the mass merchandiser exemption invalid but rather to sever the offending dates from the statute. *Id.* at 577, 431 A.2d 663.

In *Days Cove*, this Court applied the *Cities Service* analysis and concluded that chapter 161 of the Acts of 2007, which amended Md.Code (1987, 2007 Repl., 2010 Supp.) § 9–204(m) of the Environment Article ("EN"), did not constitute a special law. 200 Md.App. at 282, 27 A.3d 565. Days Cove had leased a parcel of land near Unicorn Lake in Queen Anne's County with the intention of constructing and operating a rubble landfill. *Id.* at 259–60, 27 A.3d 565. Thereafter, the General Assembly amended EN § 9–204 to prohibit the issuance of:

> any permit ... to construct or operate a rubble landfill within 4 miles of Unicorn Lake in Queen Anne's County, within 1 mile of Piscataway Creek, a Piscataway Creek tributary, or the Mattawoman Creek, or within 1 mile of any other tributary in Prince George's County that flows directly or indirectly into the Potomac River.

*Id.* at 261, 27 A.3d 565 (quoting EN § 9–204).

Days Cove filed suit challenging the amendment, arguing that the statute constituted an unconstitutional special law. The circuit court agreed. This Court reversed, explaining that EN § 9–204 was not a special law because it applied generally to prohibit the issuance of a permit to any party desiring to construct a rubble landfill within four miles of Unicorn Lake, or the other articulated waterways, and that it was "not expressly or impliedly intended to benefit or burden Days Cove alone." *Id.* at 273, 27 A.3d 565. We observed that although the law "may immediately affect only Days Cove's pending permit application, that fact alone ... is not sufficient to render it a special law." *Id.* at 276, 27 A.3d 565. We

distinguished the facts of that case from those of *Cities Service,* stating:

> Here, unlike the "mass merchandiser exemption" in *Cities Service,* Chapter 161 does not contain any qualifying or grandfather dates that are the equivalent of specifically identifying Days Cove's proposed rubble landfill....
>
> Chapter 161 prevents the Secretary of the MDE from issuing a permit to anyone, either now or in the future, who wishes to construct or operate a rubble landfill in areas protected by the law. And, simply because Chapter 161 immediately affects only one entity, that fact alone does not render it a special law.

*Id.* at 275–76, 27 A.3d 565.

In applying the *Cities Service* factors, and although neither that opinion nor *Days Cove* expressly articulated the principle, we begin with the presumption that the legislative enactment is constitutional. *See, e.g., Walker v. State,* 432 Md. 587, 626, 69 A.3d 1066 (2013) ("We begin with a presumption that the statute is constitutional, and the burden rests on Petitioner to show why that is not the case."); *Maryland Aggregates Ass'n, Inc. v. State,* 337 Md. 658, 673, 655 A.2d 886 (1995) (Courts "accord to the decisions of legislative bodies a strong presumption of constitutionality."). This deference extends to the General Assembly's determination that an exception to the application of a general law is necessary. *See Jones v. House of Reformation,* 176 Md. 43, 57, 3 A.2d 728 (1939) ("In cases of state constitutional prohibition against the passage of special laws where a general law may be made applicable, it is a rule that the question of applicability * * * is one for the Legislature to determine, and that such a statute will not be declared unconstitutional, except where it clearly appears that the Legislature was mistaken in its belief that a general law could not be made applicable." (Citations omitted.)). Writing for the Court in *Williams v. Mayor & City Council of Baltimore,* 289 U.S. 36, 46, 53 S.Ct. 431, 77 L.Ed. 1015 (1933), Justice Cardozo concluded that the decisions of the Court of Appeals applying § 33 made it clear that:

The [Maryland] Constitution does not prohibit special laws inflexibly and always. It permits them when there are special evils with which existing general laws are incompetent to cope. The special public purpose will then sustain the special form. The problem in last analysis is one of legislative policy, with a wide margin of discretion conceded to the lawmakers. Only in cases of plain abuse will there be revision by the courts.

At the outset, we note that there are factual weaknesses in CCI's special law argument. CCI's arguments rest on two factual premises: first, that its machines are "materially identical" to the machines of the other commercial bingo enterprises, and, second, that its machines complied with State law, specifically, § 12–301(3)(iv), until the 2012 amendment. On the record before us, and in light of the findings of the circuit court, both of these assertions are, at best, problematic.

As to the first matter, according to the testimony of CCI's own expert, CCI's machines operate "from a technical perspective" in a fashion distinguishable from the machines of the other establishments—in other words, CCI's machines are, in fact, different than the machines of the other establishments in some ways. Although he acknowledged the existence of these technical differences, CCI's expert did not identify nor explain them, nor did he describe in any particular detail how the other businesses' electronic bingo machines operated.[29] CCI did present evidence that the visual and auditory experience of players of its machines and those of its competitors were very similar but the relevant inquiry concerns "the possibility that [the player] will receive a prize by reason of the unpredictable operation of the machine." *Chesapeake Amusements*, 363 Md. at 30, 766 A.2d 1036. CCI provided the trial court with little, if any, evidence as to how the electronic bingo machines of the other bingo licensees were programmed and operated, nor do we have any basis on which to compare those machines with CCI's.

---

29. Ryan Hill, one of CCI's principals, gave similar testimony.

Much the same can be said of CCI's assertion that its machines complied with the requirements of the "bingo card minder" exception to the definition of slot machine found in § 12–301(3)(iv) from the time that section was added to the statute in 2008 until the section was amended in 2012. CCI presented evidence that bingo numbers for its machines were generated by a live—even though not a contemporaneous—call, which, it asserts, satisfied the 2008 law's requirement that "numbers be called on the premises by an individual where the user is operating the machine...." But CCI presented no evidence that its machines met the other requirement, *viz.*, that users, and not the device itself, marked and monitored the bingo cards displayed on the machine. As the circuit court noted in its opinion:

> Both experts and actual customers indicated that, as currently operated, CCI customers are unaware of any role played by a bingo call or by a bingo card facsimile in their use of the machines....

█ Although this suggests that the circuit court concluded that CCI's machines did not meet the 2008 version of § 12–301(3)(iv)'s "mark and monitor" requirement, it did not make an explicit finding on the matter. Similarly, the circuit court did not make explicit findings as to whether CCI's machines functioned in the same manner as its competitors. We will not base our decision on these matters but, nonetheless, the 2012 law is presumptively valid and CCI bears the burden to demonstrate otherwise. Its inability to present probative evidence as to matters critical to its argument is telling.

We now turn to the *Cities Service* factors.

### 1. Whether § 3 Was Intended to Benefit or Burden a Particular Member or Members of a Class Instead of an Entire Class

█ As this Court explained in *Days Cove*, "If an act expressly states that it applies only to a particular, named individual or entity, it may run afoul of Article III, § 33. So may 'equivalent' means of identifying a particular individual."

200 Md.App. at 271, 27 A.3d 565 (quoting *Reyes v. Prince George's County,* 281 Md. 279, 305–306, 380 A.2d 12 (1977)).

CCI's contentions can be summarized thus:

Uncodified § 3 of the 2012 law is a grandfather provision that allows all commercial bingo operators other than it to continue to offer electronic bingo games that would otherwise have been prohibited by the 2012 law's amendment to § 12–301(3)(iv). The 2008 law, which prohibited further licensing of commercial bingo operations and expanded the definition of "slot machine" to include devices that, "through the element of chance, reading of a game of chance, delivery of a game of chance or any other outcome unpredictable to the user," established a closed class of seven commercial electronic bingo machine operators, including it. CCI's machines functioned in the same way as did those operated by the six other licensed bingo establishments and all of these machines were rendered illegal by the 2012 amendment to § 12–301(3)(iv), which narrowed the scope of the "bingo card minder" exemption to the definition of slot machine. Uncodified § 3 of the 2012 law permits all licensed commercial bingo operators in the State, other than CCI, to continue to operate electronic bingo machines that would otherwise be prohibited. In CCI's view, the February 28, 2008 date is the equivalent of a specific identification of it, in the same way that the date in the Divestiture Law identified Montgomery Ward in *Cities Service.* It argues that the appropriate remedy is for us to sever the qualifying dates in § 3 from the remainder of the statute, the same remedy employed in *Cities Service.*

In response, the State argues that CCI misreads § 3. It asserts that: (1) the section applies only to "longstanding licensed operators of the instant electronic bingo machines held lawful in *Chesapeake Amusements* " and (2) § 3 does nothing more than to "permit those authorized machines to be repaired or replaced under the supervision of the [State Lottery and Gaming Control] Commission, which is tasked with certifying that any 'electronic bingo machine being au-

thorized for use after January 12, 2013, complies with all applicable laws' as of July 1, 2012." *See* CR § 12–301.1.

We begin with the 2008 law. As is relevant to the question before us, the law authorized the use of two types of electronic bingo machines. First, the temporary grandfather provision authorized entities satisfying certain requirements to "continue to operate a game of instant bingo ... using electronic machines ..." for a period of approximately six months.[30] Second, § 12–301(3)(iv) authorized the use of electronic bingo card minders that satisfied specific statutory requirements. Thus, the only types of electronic machines authorized for continued use in bingo games under the 2008 law were those offering "instant bingo" and bingo card minders.

The 2009 law made minor, and in our view irrelevant, changes to the 2008 law's temporary grandfathering provision. The 2009 law did not amend the bingo card minder exemption, nor did it add or remove a classification of "machines" authorized for use in bingo games. Thus, as in 2008, the only machines authorized for use after the effective date of the 2009 law were bingo card minders and those offering "instant bingo."

As in the 2008 and 2009 laws, the 2012 law's grandfathering provision, codified at § 12–308, authorizes entities satisfying certain requirements to "continue to operate a game of instant bingo ... using electronic machines. ..." The 2012 law made only minor changes to the scope of the class covered by the existing grandfathering provision. The 2012 law also narrowed the bingo card minder exception, codified at § 12–301(3)(iv), by imposing additional restrictions on the type of machines that fall within the exception. As with the 2008 and 2009 laws, §§ 12–301(3)(iv) and 12–308 recognize two, and only two, categories of electronic bingo machines: electronic bingo card minders and electronic machines offering "instant bingo."

---

**30.** The 2008 law also permitted certain types of paper pull tab instant bingo machines. *See* § 12–301(3)(iii).

CCI's machines do not satisfy the requirements for inclusion in either of these two classes. At this stage in the litigation, there is no dispute that CCI does not operate machines offering "instant bingo." Likewise, there is no dispute that CCI's machines do not satisfy the requirements of the 2012 law's bingo card minder exception.

To get around this problem, CCI suggests that the 2012 law established a third category of permitted machines, one that includes all "electronic bingo machines" of any variety, to which it rightfully belongs. In support of this position, CCI concentrates on two terms introduced in the uncodified portions of the 2012 law: "electronic bingo machines" (uncodified § 3) and "electronic instant bingo machines" (uncodified § 4). In CCI's view, the General Assembly's use of the phrase "electronic bingo machines" in § 3 reveals a legislative intent to recognize a class of "electronic bingo machines" that is broader than those permitted in the codified sections of the law, and to permit the continued, indefinite use of those machines so long as the section's requirements are satisfied— i.e., so long as the machines were in operation as of February 28, 2008 and operate in the same manner as they did on February 28, 2008.

The problem with CCI's interpretation of the term "electronic bingo machine" is that it is irreconcilably in conflict with § 12–301(3)(iv). Were we to interpret uncodified § 3 as establishing a new class of "electronic bingo machines" of any variety, the new class would encompass both electronic machines offering "instant bingo" and bingo card minders. The result would be that the qualifying dates contained in uncodified § 3 would apply to both of these classes of machines. While the qualifying dates in § 3 correspond to the qualifying dates of the instant bingo grandfathering provision, they directly conflict with the statute's authorization in § 12–308(3)(iv) for the use of bingo card minders because that section contains no qualifying dates whatsoever.[31]

---

**31.** A similar conflict exists with respect to those paper pull tab machines authorized for use by § 12–301(3)(iii).

In our view, a better interpretation of uncodified § 3 is that it applies solely to those machines that fall within the scope of § 12–308's grandfathering provision. While not identical, the language employed in both provisions is similar: "electronic machines" (§ 12–308) and "electronic bingo machines" (uncodified § 3). The qualifying dates employed in uncodified § 3 echo those found in the § 12–308 grandfathering provision, and act to ensure that the class of operators operating machines pursuant to § 12–308 remains consistent with the grandfathering provisions in the 2008 law. This limitation is in accordance with the legislature's intention to curb the expansion of commercial gambling operations in Maryland. In line with this interpretation, uncodified § 3 permits those who offer instant bingo on authorized machines pursuant to § 12–308 to repair and replace the machines so long as two conditions are satisfied: 1) "the machines operate in the same manner as those in operation . . . as of February 28, 2008", and 2) "the organization does not operate more than the number of electronic bingo machines in operation as of February 28, 2008." Contrary to CCI's contentions, uncodified § 3 does not establish nor recognize a new, separate class of electronic bingo machines or electronic bingo machine operators from which CCI was excluded.

Applying this interpretation to the facts at bar, CCI's electronic machines do not offer, and have never offered, "instant bingo," nor do CCI's machines satisfy the other requirements set forth in § 12–308. As a result, CCI's machines fall outside the scope of the class authorized under § 12–308. Because use of its machines is not authorized by § 12–308, CCI cannot, pursuant to uncodified § 3, repair and replace its machines, regardless of § 3's qualifying dates.

CCI places great weight on its contention that its machines fell within the scope of the 2008 law's bingo card minder exception. Putting aside, for a moment, the fact that this assertion is problematic based on the record in this case, CCI's argument is misplaced. Even if we assume that CCI is correct that its machines were authorized pursuant to the bingo card minder exemption as it existed in 2008, there is no

dispute that CCI's machines fail to satisfy the requirements for inclusion in this class under the 2012 law. Uncodified § 3 applies only to machines "authorized" for use "after July 1, 2012" (the 2012 law's effective date). The type of machines CCI operated at the Crooked I are not authorized for use after July 1, 2012 by either § 12–308 or § 12–301(3)(iv), the only two applicable provisions authorizing the use of machines in bingo games after that date.

Finally, CCI points out that the 2012 law's uncodified § 4 introduces the term "electronic instant bingo machine." Both parties equate the type of machine authorized under this provision with the type of machine authorized under § 12–308—i.e., both parties assume that an "electronic instant bingo machine" and an "electronic machine" offering instant bingo are the same. We need not, and, therefore, do not, express a view on the matter. CCI does not contend that its machines are "electronic instant bingo machines," nor does CCI challenge the constitutionality of uncodified § 4. For our purposes, it is sufficient for us to conclude, as we have, that uncodified § 3 of the 2012 law does not establish a distinct class of gambling machines from which CCI was improperly excluded.

### 2. Whether Uncodified § 3 Identifies Particular Individuals or Entities

■ Uncodified § 3, on its face, does not identify a particular individual or entity. CCI asserts that, in light of the legislative history of the 2012 law, the combination of the instant bingo grandfather provisions and uncodified § 3 equate to an identification of CCI because the legislature intentionally excluded it from the scope of § 3. In this context, CCI emphasizes that Senator DeGrange and Ms. Gruber used its machines as examples of a type of machine that the 2012 law would prohibit. In our view, this observation does not amount to a statutory identification of CCI for constitutional purposes. CCI's assertions are similar to those set forth by the appellants in *Days Cove*. In that case, we explained:

It appears that Days Cove is asking us to discern some illicit motive on the part of the General Assembly from the

legislative testimony presented in favor of Chapter 161. This is not, however, a proper line of inquiry for this Court. As we stated in *Pack Shack, Inc. v. Howard County*, 138 Md.App. 59, 72, 770 A.2d 1028 (2001): "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." We explained: "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *Id.*

Indeed, "[i]t is well-settled that when the judiciary reviews a statute or other governmental enactment, either for validity or to determine the legal effect of the enactment in a particular situation, the judiciary is ordinarily not concerned with whatever may have motivated the legislative body or other governmental actor." *Workers' Comp. Comm' v. Driver*, 336 Md. 105, 118, 647 A.2d 96 (1994). Thus, legislative testimony is largely irrelevant with respect to a determination as to whether Chapter 161 is a special law. And, for this reason, we attach no significance to the fact that no other landfill facility was mentioned in legislative testimony or an "analysis" of the bill. Moreover, the focus of testimony and analysis was on Days Cove simply because there was no other entity actively planning, at that time, to construct a landfill in any of the areas covered by Chapter 161.

200 Md.App. at 270–71, 27 A.3d 565.

Moreover, assuming for the purposes of analysis that the concerns of Senate President Miller and Senator DeGrange should be imputed to the General Assembly as a whole, we perceive no impropriety. In the words of the circuit court, CCI obtained its license "in the fleeting moment of opportunity" that existed after the legislature had clearly signaled its intention to restrict the growth of locally-licensed bingo operations in the 2008 law. As we have related, prior to the introduction of the 2012 legislation, Attorney General Gansler and senior members of his office had opined on no less than

four separate occasions that CCI's machines, and the way that they were operated, violated then-current Maryland law. Further, even if CCI's machines were legal under the 2008 law, the prohibition against special laws does not restrict the General Assembly's authority to prohibit what was previously permitted. *See Days Cove*, 200 Md.App. at 276, 27 A.3d 565 (that legislation immediately affects only one entity "is not sufficient to render it a special law"); *cf. Stone v. Mississippi*, 101 U.S. 814, 818, 25 L.Ed. 1079 (1879) ("[N]o legislature can curtail the power of its successors to make such laws as they may deem proper in matters of [the] police power.") (Internal quotation marks and citation omitted.).

In this context, the Calvert County State's Attorney declined to prosecute CCI because, in her view, CCI's practices violated "the spirit" but not "the letter" of the 2008 law. The 2012 amendments to the card-minder exception, § 12–301(3)(iv), appear to have been an effort to address her concerns. It would be a singular exercise in futility for the legislature to amend a law to strengthen a prosecutor's hand while at the same time grandfathering the very practices that the amendment was intended to address.

### 3. Whether a Particular Entity Sought and Received Special Advantages from the Legislature, or Other Similar Entities Were Discriminated Against by Uncodified § 3

 As the circuit court noted in its opinion, the testimony established that both CCI and the Chesapeake Beach Post of the American Legion sought relief in the 2012 Session of the General Assembly, with the difference being that the American Legion was successful but CCI was not. The record suggests that the American Legion Post sought what became uncodified § 4 of the 2012 law because, prior to the enactment of the 2008 law, the Post had been operating ten machines under the belief that it did not need a license, and, as a result, could not satisfy the requirements of the instant bingo grandfathering provisions. The American Legion eventually ob-

tained its bingo license at approximately the same time as CCI.

In our view, the purpose of the prohibition against special laws is "to prevent one who has sufficient influence to secure legislation from getting an undue advantage over others" *Cities Service,* 290 Md. at 568–69, 431 A.2d 663. We are not convinced that an American Legion Post in a small town can wield the sort of "influence" that § 33 is intended to protect against. Moreover, unlike the American Legion, CCI has never operated, nor sought to operate, electronic machines offering instant bingo. We are not persuaded that CCI has been unfairly targeted by its exclusion from uncodified § 4.

### 4. Whether the Distinctions Drawn by Uncodified § 3 Are Arbitrary and Without Any Reasonable Basis

■ On the facts before us, this factor overlaps with CCI's claim that the 2012 law violates equal protection principles because, as to its latter claim, there is no dispute that the applicable test is one of rational basis. *See Days Cove,* 200 Md.App. at 278 n. 13, 27 A.3d 565. CCI argues that the enactment of uncodified § 3 fails the rational basis test because it prohibits only the Crooked I from operating its electronic bingo machines while permitting other bingo licensees to continue operating similar machines. Specifically, CCI argues that the legislature's use of the February 28, 2008 cutoff date in § 3 is arbitrary and unreasonable.

■ In evaluating this claim, we start with a strong presumption that the legislative enactment is constitutional. *See, e.g., Maryland Aggregates Ass'n,* 337 Md. at 673, 655 A.2d 886. The burden is on CCI, as "the one attacking the legislative arrangement," to demonstrate that the legislation lacks a rational basis by negating "every conceivable basis which might support it." *Frey v. Comptroller of the Treasury,* 422 Md. 111, 163, 29 A.3d 475 (2011) (internal brackets, quotation marks, and citation omitted); *see also Murphy v. Edmonds,* 325 Md. 342, 368, 601 A.2d 102 (1992) ("A statutory classification tested by the rational basis standard enjoys a strong presumption of constitutionality, and a reasonable

doubt as to its constitutionality is sufficient to sustain it." (internal brackets, quotation marks, and citation omitted)).

In our view, CCI has failed to negate all possible rational bases for the General Assembly's use of February 28, 2008 as a qualifying date in § 3. As the trial court pointed out, February 28, 2008 has been the cut-off date for the instant bingo grandfather clause since the clause was first enacted in 2008. The General Assembly's use of the same date in § 3 is consistent with the cut-off date for the operation of electronic machines in the instant bingo grandfather provisions, and is further consistent with the legislature's previously articulated intent to prohibit commercial establishments from operating a larger number of electronic bingo machines than were operational prior to its consideration of the 2008 bill. These observations, alone, establish a rational basis for § 3's use of February 28, 2008. The legislative history to the 2008, 2009 and 2012 laws also indicates that at least some of the commercial bingo operations in existence prior to February 28, 2008 were generating significant tax revenues, an income stream which the legislature did not wish to halt abruptly,[32] whereas CCI's did not begin operating until May of 2009, well after the legislature articulated its intent to curb the spread of commercially operated electronic bingo machines.

### 5. The Public Interest Underlying the Enactment, and the Inadequacy of the General Law to Serve That Interest

 It is well-established that the State's regulation of commercial gambling activities serves an important public interest. *See, e.g., F.A.C.E. Trading, Inc. v. Todd,* 393 Md. 364, 376–78, 903 A.2d 348 (2006); *Ford v. State,* 85 Md. 465, 475, 37 A. 172 (1897); *Holliday Amusement Co. v. South*

---

**32.** Chapter 661 of the Laws of 2009 stated that the grandfather provision extended by that statute and made permanent in the 2012 legislation was intended, among other things, as "a mechanism to provide additional funding required to address the State's important fiscal needs on a temporary basis while the State video lottery terminal program is being implemented."

*Carolina,* 493 F.3d 404, 410 (4th Cir.2007). The 2012 law's slot machine prohibition is an adequate step toward serving this interest, and, as can be seen above, the grandfather provisions providing for the continued operation of certain types of instant bingo machines are rational in light of the history of slot machine regulation in Maryland.

Upon consideration of the *Cities Service* factors, we agree with the circuit court that § 3 is not a special law.

## II. Equal Protection

■■■ Next, CCI argues that the General Assembly's use of the February 28, 2008 cut-off date in uncodified § 3 violated the equal protection principles espoused in Article 24 of the Maryland Declaration of Rights. Article 24 states, in pertinent part: "That no man ought to be ... deprived of his ... property, but by the judgment of his peers, or by the Law of the land." Although not expressly stated, it is well-established that "the concept of equal protection is inherent in [Article 24's] text." *Frey v. Comptroller of the Treasury,* 422 Md. 111, 176, 29 A.3d 475 (2011). In *Murphy v. Edmonds,* 325 Md. 342, 601 A.2d 102 (1992), the Court of Appeals explained that:

> In most instances when a governmental classification is attacked on equal protection grounds, the classification is reviewed under the so-called rational basis test. Generally under that test, a court will not overturn the classification unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the governmental actions were irrational. A statutory classification reviewed under the rational basis standard enjoys a strong presumption of constitutionality and will be invalidated only if the classification is clearly arbitrary.

325 Md. at 355–56, 601 A.2d 102 (internal quotation marks and citations omitted). As explained above, there is no dispute that the appropriate test on the facts before us is one of rational basis, nor do the parties dispute that the regulation of electronic bingo machines is a legitimate governmental purpose. We have already established that CCI has failed to prove that

the legislature's use of the February 28, 2008 date in § 3 lacked a rational basis, or that it improperly discriminated against CCI. As such, the legislature did not run afoul of equal protection principles in its passage of the 2012 law.[33]

## III. Taking Without Due Process

CCI also argues that the 2012 law constitutes a taking without due process in violation of Article 24 of the Maryland Declaration of Rights [34] and Article III, § 40 of the Maryland Constitution.[35] Specifically, it asserts that the 2012 law:

> takes CCI's ability to operate its electronic bingo machines for which it had a lawful commercial bingo license through imposing a retroactive grandfather date. . . . CCI had no ability and no notice that it needed to comply in 2007 or 2008 with grandfather dates that are now being applied retroactively in order to keep the commercial bingo license after July 1, 2012. CCI had no notice that it was required to obtain a license in 2007 for machines that were not regulated by law knowing that at some point in the future . . . all licensees would be permitted to operate indefinitely if they had obtained their licenses before July 1, 2007 and satisfied the other criteria of the grandfather clauses.

These contentions are unpersuasive.

First, we have already dispelled the assumptions upon which CCI's argument is premised. Second, as the State

---

**33.** As we previously explained, the record does not support CCI's assertion that its machines were "materially identical" to the machines of the other establishments. Further complicating CCI's position is the undisputed fact that it received its bingo license under widely different circumstances than the other bingo licensees.

**34.** Article 24 provides: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the Land."

**35.** Section 40 states: "The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation."

points out, nothing has been taken from CCI. The passage of the 2012 law did not revoke CCI's bingo license. It simply clarified the type of machine that CCI, as a commercial bingo licensee, could legally operate. Nothing in the law prevented CCI from complying with it.

Third, even before it began operations, CCI was on notice from the Attorney General's Office that its proposed machines were illegal. CCI does not challenge the trial court's conclusion that its machines did not offer "instant bingo" as that term was used in *Chesapeake Amusements.* Moreover, as we have discussed, CCI presented no evidence as to how its machines complied with the "mark and monitor" requirement for electronic bingo card minders. Thus, CCI's machines were not covered by the 2008 law's instant bingo grandfather clause and CCI has failed to demonstrate how its machines otherwise complied with the statute. At best, CCI was able to show that the State's Attorney for Calvert County had reservations about filing criminal charges against it but that falls short of proving that its machines complied with the law. In order to prevail on its takings claim, CCI, among other factors, must prove that its machines complied with the law prior to the 2012 amendments. *See, e.g., Samuels v. Tschechtelin,* 135 Md.App. 483, 523, 763 A.2d 209 (2000) ("To be successful in an action alleging denial of procedural due process in violation of a property interest, a plaintiff must demonstrate that he had **a protected property interest** . . . ." (emphasis added)); *Reese v. Department of Health and Mental Hygiene,* 177 Md.App. 102, 153, 934 A.2d 1009 (2007) ("[T]he common law concept of property refers to the right and interest a person has in an object, which extends beyond ownership and possession to include the **lawful,** unrestricted right of use, enjoyment, and disposal of the object." (emphasis added)).

### IV. The Circuit Court's Discovery Rulings

Lastly, CCI asserts that the circuit court abused its discretion in quashing subpoenas directed at Senate President Miller, Ms. Gruber, and the General Assembly. We disagree.

In *Harris v. State,* 420 Md. 300, 330–31, 22 A.3d 886 (2011), the Court of Appeals explained that the enforcement of subpoenas "must necessarily be committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues. . . ."; *see* Maryland Rule 2–510(e) ("[T]he court may enter an order that justice requires to protect the person [subpoenaed] from annoyance, embarrassment, oppression, or undue burden or cost. . . ."). Applying these standards here, we cannot say that the circuit court abused its discretion in quashing the subpoenas. CCI's attempt to prove that Senate President Miller targeted CCI in the passage of SB 864 is fruitless because such a fact, even if true, is not relevant to our analysis. *See Days Cove,* 200 Md.App. at 270–71, 27 A.3d 565. Moreover, and in any event, the record contains several pieces of evidence making it clear that Senate President Miller, Senator DeGrange, and Ms. Gruber knew that the 2012 law's amendments to the slot machine statute clarified that the type of machines being operated by CCI were illegal, and, further, that both Senator DeGrange and Ms. Gruber used CCI's machines as examples of the type of machines that the 2012 law would prohibit. Thus, the record already reflects what CCI wishes to discover. The circuit court did not abuse its discretion in quashing the subpoenas.

■ The State suggests that, in the event that we affirm the decision of the circuit court as to CCI's claims, its crossappeal is rendered moot. An appeal is moot when it no longer presents " 'a controversy between the parties for which, by way of resolution, the court can fashion an effective remedy.' " *Potomac Abatement Inc. v. Sanchez,* 424 Md. 701, 710, 37 A.3d 972 (2012) (quoting *Adkins v. State,* 324 Md. 641, 646, 598 A.2d 194 (1991)). We agree with the State that our decision as to CCI's appellate contentions moots the cross-appeal.

**THE CROSS–APPEAL OF THE STATE IS DISMISSED AS MOOT. THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY IS AFFIRMED.**

**APPELLANTS TO PAY COSTS.**